724 A.2d 836 (1999)
319 N.J. Super. 1
STATE of New Jersey, Plaintiff-Respondent,
v.
Robert BISACCIA, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Anthony Proto, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Samuel Louis Corsaro, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Louis Fulco, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Charles Muccigrosso, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Nicholas DeStefano, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted January 13, 1999.
Decided March 2, 1999.
*838 Charles H. Landesman, Designated Counsel, for defendant-appellant Robert Bisaccia (Ivelisse Torres, Public Defender, attorney; Mr. Landesman, on the brief).
Alan Zegas, West Orange, for defendants-appellants Anthony Proto and Samuel Louis Corsaro (Mr. Zegas, attorney; Weissbard and Wiewiorka, former attorneys; Harvey Weissbard, on the brief).
Mark E. Tabakman, Designated Counsel, for defendant-appellant Charles Muccigrosso (Ivelisse Torres, Public Defender, attorney; Mr. Tabakman, on the brief).
Ivelisse Torres, Public Defender, for defendants-appellants Louis Fulco and Nicholas DeStefano (Michael C. Kazer, Designated Counsel, on the brief for appellant Fulco; Jeffrey L. Weinstein, Designated Counsel, on the brief for appellant DeStefano).
Robert E. Bonpietro, Deputy Attorney General, for plaintiff-respondent in the argued cases (Peter Verniero, Attorney General, attorney; Mr. Bonpietro, on the briefs).
Peter Verniero, Attorney General, for plaintiff-respondent in the submitted cases (Robert E. Bonpietro, Deputy Attorney General, on the briefs).
Before Judges STERN, BRAITHWAITE and WECKER.
*837 The opinion of the court was delivered by STERN, P.J.A.D.
The six appellants ("defendants") were indicted with ten other individuals and two corporations in a seventy-count indictment, the last fifty-one of which were severed for purposes of trial. The six appellants and defendant Casiere were jointly tried on the first nineteen counts of the indictment.[1] Count one charged defendants with conspiracy to commit racketeering, N.J.S.A. 2C:41-2d and 2C:5-2. Count two charged all six with racketeering, N.J.S.A. 2C:41-2b, -2c. Count three charged Bisaccia as a leader of organized crime, N.J.S.A. 2C:5-2g. Count four charged the defendants except Proto with conspiracy involving the hijacking of a trailer load of cigarettes, N.J.S.A. 2C:5-2. Counts five and six charged the same defendants with robbery, N.J.S.A. 2C:15-1 and 2C:2-6, and kidnapping the driver, N.J.S.A. 2C:13-1b and 2C:2-6, while count seven charged Fulco and Muccigrosso with receipt of the stolen cigarettes, N.J.S.A. 2C:20-7 and 2C:2-6. *839 Count eight charged Bisaccia and DeStefano with conspiracy to commit theft by extortion, N.J.S.A. 2C:5-2, and count nine charged them with the substantive crime, N.J.S.A. 2C:20-5a and 2C:2-6. Count ten charged Bisaccia and Corsaro with conspiracy to commit arson and burglary of the Attorney General's office in Fairfield, N.J.S.A. 2C:5-2, and count eleven charged them with conspiracy to rob the Coin Depository Corp. in Elizabeth, N.J.S.A. 2C:5-2. Counts twelve and thirteen charged Bisaccia and Corsaro with conspiracy to commit extortion, N.J.S.A. 2C:5-2, and the substantive theft by extortion relating to J & M Pest Control, N.J.S.A. 2C:20-5a, -5g; 2C:2-6. Count fourteen charged Bisaccia, Corsaro and Proto with conspiracy to commit theft by extortion with respect to the use of waste dumpsters owned by the Savino Companies, N.J.S.A. 2C:5-2, and count fifteen charged Bisaccia, Corsaro and Proto with the substantive offense, N.J.S.A. 2C:20-5a, -5g; 2C:2-6. Counts sixteen and seventeen charged them with conspiracy to commit theft, N.J.S.A. 2C:5-2, and theft from the Savino Companies, N.J.S.A. 2C:20-3a; 2C:2-6. Count eighteen charged Bisaccia, Corsaro and Proto with a conspiracy involving commercial bribery of Ross Esporrin, an employee of Keithley Construction Corp., with respect to the use of the Savino dumpsters, N.J.S.A. 2C:5-2, and count nineteen charged them with the substantive crime of commercial bribery, N.J.S.A. 2C:21-10c,-10d; 2C:2-6.
Counts one and two were dismissed during trial as to Fulco and Muccigrosso. Counts four, five and six were dismissed as to all defendants insofar as the cigarette hijacking crimes included an armed robbery and kidnapping. Bisaccia, Corsaro and Proto were found guilty of the racketeering conspiracy and racketeering. Bisaccia was found guilty on count three as a leader of organized crime. All defendants except Proto who was not charged in count four were found guilty of the conspiracy to receive the hijacked cigarettes. Fulco and Muccigrosso were found guilty on count seven with regard to receiving stolen cigarettes. Corsaro was found guilty on count ten, the conspiracy with regard to the Attorney General's office. Bisaccia, Corsaro and Proto were found guilty of counts fourteen, sixteen, seventeen, eighteen and nineteen concerning the theft from the Savino Companies and commercial bribery of Esporrin.
Bisaccia received a sentence aggregating forty years with twenty years before parole eligibility. Corsaro received an aggregate sentence of twenty-six years with thirteen years before parole eligibility. Fulco was sentenced to ten years imprisonment with five years before parole eligibility. Proto was sentenced to terms aggregating sixteen years with eight years before parole eligibility. DeStefano was sentenced to seven years imprisonment, and Muccigrosso received concurrent sentences aggregating seventeen years with eight-and-one-half years before parole eligibility.

I.
Jury selection commenced on March 2, 1992, and the trial commenced on June 11, 1992. The case was submitted to the jury on March 3, 1993.
On February 9, 1993, shortly before summations were to begin, the trial judge received a letter from M.C., a juror who had been excused during the trial because of his exposure to newspaper accounts regarding defendant Muccigrosso. On February 11, 1993, the trial judge interviewed M.C. outside the presence of the jury. According to M.C., the jurors regularly discussed newspaper reports about the trial, but M.C. could only name two jurors who initiated such discussions. M.C. also claimed that there were "always [news]papers in the [jury] room." On February 20, 1993, the judge found M.C.'s allegation of rampant juror misconduct to be "inherently and expressly unreliable, untrustworthy and lacking any credible ring of truth whatsoever." Thus, the judge declined to voir dire the jury regarding M.C.'s allegations.
In the interim, following a report that a juror's car was shot at on the evening of February 16, 1993, the State moved on February 17, 1993, to have the jury sequestered. After granting the motion, the trial judge discharged the juror whose car was shot at and met with the remaining jurors in chambers, *840 outside the presence of defendants and counsel, to discuss the sequestration. At the meeting, juror number 8, M.B., told the judge that he could not "make a fair decision here." The judge made no inquiry as to M.B.'s comment and advised M.B. that he would remain on the jury. At a subsequent meeting the next morning attended by the judge, jury and Court Administrator, M.B. again addressed the judge on the same subject. The record reflects the following exchange:
[M.B.]: As I was trying to say to you yesterday, your Honor, you know, I haven't been to court in some time, I have been on the job, when you are on the job you hear things you don't want to hear, and like I said, I want to make a fair decision, but
THE COURT: Our purpose in meeting here now is not to go into the merits of the case, that is not our purpose, the purpose of this meeting deals with the problems that arise out of sequestration. Those are the problems.
[M.B.]: Could I meet with you at another time, you and the seven lawyers, then?
THE COURT: We will reserve on that.[2]
At the February 18, 1993 meeting, two jurors also voiced concern about being followed by a man who, according to one of the jurors, was "always in the courtroom." According to the other juror, the man had "approached [him] in the car wash," about two weeks earlier and asked him was "this your kid." The juror reported that he "walked away from" the man.
The transcript of the February 18, 1993 meeting was made available to all counsel the next day. While the proceedings on February 19, 1993, were thereafter devoted to argument regarding former juror M.C., defense counsel also asked to be heard regarding the previous day's in camera meeting between the judge and jury and specifically regarding the "[M.B.] issue." The judge declined to hear argument at that time, saying that he would entertain argument on the M.C. matter and would address the M.B. matter in the future.
The next day, Saturday, February 20, 1993, the court announced its decision denying further jury inquiry regarding M.C.'s letter and ordered defense counsel to begin summations. Defense counsel moved for a mistrial on the grounds of the judge's February 18, 1993 meeting with the jurors and M.B.'s statement that he could not be fair and wanted to speak to the judge. The judge refused to hear the motion that day. During the course of this discussion, the judge for the first time told defense counsel about his prior meeting with the jurors on February 17, 1993, and told them that he would make the transcript available to them. Despite defendants' arguments that they were not prepared to present their summations on that day, the summations commenced on February 20, 1993.
During the next few days, at breaks in the summations, defense counsel continued to move for a voir dire of juror M.B. and to be heard on other issues regarding the meetings. The judge stated that he would hear these motions after summations were completed. At the conclusion of the prosecutor's summation on March 1, 1993, defense counsel argued that the entire jury should be interrogated regarding the meetings of February 17 and 18, 1993, or, in the alternative, that a mistrial should be declared. The statements of M.B. during the meetings was one of the grounds for these motions. Particularly in light of the fact that defendant Fulco had endeavored in open court on February 20, 1993 to question M.B. directly as to why he could not be fair, the prosecutor conceded in his argument that M.B. should be interviewed. According to the prosecutor:
Obviously, if [M.B.] said that he could [not] be fair, he probablynot probably, he should be interrogated in [sic] especially in light that Mr. Fulco jumped on that Saturday and yelled right at him, [M.B.], come forward. He should be inquired as to whether or not those actions by Mr. Fulco had anyplay any part in his ability to be fair....
The judge denied the application to question M.B. The judge stated that he had previously *841 conducted three interrogations of the jury regarding their exposure to mid-trial publicity, and had frequently instructed the jury not to discuss the case with anyone. He presumed the jurors followed his instructions. With regard to M.B., the judge held:
the Court is of the sound view that an insufficient foundation has been established to warrant any further investigation. To entertain a voir dire of this juror and other jurors, based on this colloquy [between the judge and M.B.], would, in my judgment, be onean application which is unfounded and without any merit.
The judge stated that it was apparent to him based on M.B.'s demeanor, that M.B.'s statements "were motivated [by] nothing other than an attempt to gain the sympathy of the Court relative to the need for his continued confinement as a sequestered juror." He emphasized that M.B. only claimed he could not be fair after he learned that he was to be sequestered.
Subsequently, the State suggested that because of defendants' objections to M.B., he should be "designated as the alternate juror." Defendants objected; they believed that M.B. should be removed from the jury altogether and had possibly tainted the entire jury. The judge denied both requests and the alternate was selected "by random" drawing.
On the second day of deliberations, March 4, 1993, the jury sent out the following note to the trial judge at 3:07 p.m.: "we, the jurors, are at a standstill. Juror Number 8 and 9 have determined a certain verdict and [are] not willing to discuss any matter with any of us. We feel that we need someone to intervene so that we can continue our deliberation. Thank you." Most counsel requested that the judge instruct the jury to continue its deliberations. Bisaccia's counsel moved for a mistrial. The judge denied the mistrial motion because he did not believe that the note showed that the jury could not be fair and impartial. However, he reminded the jurors of their obligation to deliberate with each other.
At 6:05 p.m. the same day, the jury sent another note to the judge:
[W]e have a juror that is in fear of his life. He feels he cannot render a fair decision. We have tried numerous attempts at deliberating, to no avail. We would like to know if at all possible the alternate can take his place.
Also, we would like to adjourn for today. Thank you.
The record does not reveal the identity of the juror. The attorneys for defendants Fulco and DeStefano asked that a mistrial be declared on the basis that the juror's remark had "tainted" the entire jury. The other defense counsel requested that the jury be instructed that it must continue to deliberate. In addition, Bisaccia's attorney asked that the jury be interrogated. The prosecutor recommended that the juror in question "be excused from service" because he had indicated that he could not render a verdict based on the evidence.
The judge denied the mistrial motion and the motion to dismiss the juror. He reasoned that the juror's refusal to deliberate was "nothing other than an attempt by a juror to avoid the responsibility of deliberation; to avoid the unpleasantries of sequestration; to attempt to get off the jury...." Instead, he instructed the jury:
Now, I'd likeI'm going to say something to the jury and I'd like all of you to listen to me. Each one of you has taken an oath in this case at the very beginning. Part of that oath is if the occasion warrants deliberations, to deliberate in accordance with the Court's instruction. Deliberate in accordance with the evidence in this case. Plus, I indicated to you yesterday, your verdict cannot be true unless it is strictly and solely in accordance with the evidence.
You have a responsibility now and a duty to deliberate.... And I instruct you to continue with your deliberations and you will continue in accordance with the manner that I've instructed you.

II.
Among other things, defendants argue that the trial judge improperly failed to voir dire juror M.B. after he reported that *842 he could no longer be "fair." They also argue that the judge abused his discretion by refusing to conduct a voir dire when the jurors reported that one juror was in "fear of his life." They also argue that a mistrial should have been granted. We agree that the judge improperly declined to make necessary inquiries on these subjects.
The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants "the right to... trial by an impartial jury." State v. Williams, 93 N.J. 39, 60, 459 A.2d 641 (1983); State v. Scherzer, 301 N.J.Super. 363, 486, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997). Thus, "a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." Williams, supra, 93 N.J. at 60, 459 A.2d 641. As a result, the trial judge must take action to assure that the jurors have not become prejudiced as a result of facts which "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." Scherzer, supra, 301 N.J.Super. at 486, 694 A.2d 196 (quoting Panko v. Flintkote Co., 7 N.J. 55, 61, 80 A.2d 302 (1951)). "The test is `not whether the irregular matter actually influenced the result but whether it had the capacity of doing so.'" Scherzer, supra, 301 N.J.Super. at 486, 694 A.2d 196 (quoting Panko, supra, 7 N.J. at 61, 80 A.2d 302).
In State v. Bey, 112 N.J. 45, 74-92, 548 A.2d 846 (1988), a capital murder case, our Supreme Court emphasized the need for determining whether jurors were exposed to prejudicial outside influences. There the Court held that the trial court's refusal to voir dire the jury about newspaper articles concerning defendant violated defendant's right to a fair trial and required reversal. Id. at 81, 548 A.2d 846. It concluded that where there is a realistic possibility that prejudicial information reached the jurors, the court should conduct a voir dire to determine whether any exposure occurred and, where it occurred, to determine what was learned and whether the jurors remained capable of fulfilling their duties in an impartial manner. Id. at 86-87, 548 A.2d 846. The Court made clear that:
The procedure of questioning an impaneled jury when prejudicial publicity threatens the fairness and integrity of a defendant's trial should not be invoked begrudgingly. While we do not mean to suggest that any publicity relating to the defendant or the proceedings will automatically require that the jury be polled, a court might properly choose to err on the side of caution when ruling on such motions. The procedure is prophylactic in nature, designed to uncover potential prejudice to extremely significant constitutional rights that might otherwise go wholly undetected, and to do so at a time when corrective measures remain possible, that is, before ordering a new trial has become the only option. Hence the polling procedure operates to safeguard the rights of the accused and vindicate societal interests in the fair and efficient administration of the criminal justice system. Further,... the mid-trial voir dire imposes a minimal burden on the court system.

Id. at 89-90, 548 A.2d 846 (citations omitted).
Bey, supra, deals with the need to voir dire the jury concerning publicity where it is unclear whether the jury has been exposed to mid-trial publicity. See also State v. Harris, 156 N.J. 122, 150-54, 716 A.2d 458 (1998). However, where, as here, there is the possibility of actual juror taint or exposure to extraneous influences (including jury misconduct and "comments made to jurors by outside sources"), the judge must voir dire that juror and, in appropriate circumstances, the remaining jurors. State v. Scherzer, supra, 301 N.J.Super. at 486-91, 694 A.2d 196 (where the judge's conduct of jury inquiries was found to be adequate).
In State v. Wormley, 305 N.J.Super. 57, 68-70, 701 A.2d 944 (App.Div.1997), certif. denied, 154 N.J. 607, 713 A.2d 498 (1998), at a lunch break during the first day of trial, a juror told the judge that she knew the State's primary witness and was familiar with the circumstances of the crime. Id. at *843 68, 701 A.2d 944. The juror denied that she had revealed her knowledge to the other jurors. Id. at 69, 701 A.2d 944. The judge excused the juror without questioning the other jurors. Id. On appeal following conviction, we held that the judge's failure to make inquiry of the remaining jurors was reversible error, even though the judge was not asked to voir dire them. Id. We reasoned that even though the dismissed juror denied conveying her knowledge to the other jurors, "there was a strong likelihood that, even indirectly or unintentionally, she may well have." Id. at 70, 701 A.2d 944.
In State v. Scherzer, supra, we recently summed up the law in this area:
The thrust of the New Jersey and federal cases on mid-trial allegations of jury misconduct is that the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality. Although the trial judge has discretion in the way to investigate allegations of jury misconduct, an adequate inquiry on the record is necessary for the purposes of appellate review.

Id. at 487-88, 694 A.2d 196 (citation omitted; emphasis added).
Stated differently,
[W]hen a circumstance arises suggesting that a juror may in fact be tainted .... the trial court, upon being apprised of such a circumstance, is obliged to interrogate the juror in the presence of counsel and to determine if there is a taint and if so, if any other jurors have been infected thereby.
Pressler, Current N.J. Court Rules, comment 2 on R. 1:16-1 (1999).
We conclude that the trial judge should have questioned M.B. about his statements that he could no longer be fair, particularly after indicating that during the trial's recess he had heard things he did not want to hear. M.B.'s statement revealed that he may have been exposed to outside information. The jury had recently come back from an almost month long break in the trial. It was at least possible that M.B. may have been exposed to prejudicial information during that time and may have shared that information with other jurors. Moreover, while the judge understood M.B.'s statements may be read to be a mere reaction to sequestration or an effort to get out of jury duty, which in itself required further inquiry, there were other inferences warranting development. Without the judge questioning M.B. about what he meant by his statements, we have no way of knowing what his exposure may have been or how prejudicial that exposure was. As the Court stated in Bey, supra, 112 N.J. at 89-90, 548 A.2d 846, without a voir dire, "potential prejudice to extremely significant constitutional rights... might otherwise go wholly undetected." The prior voir dire referred to by the judge as a basis for not interviewing M.B. on this occasion all occurred before the January 1993 break and the indication that during the break he may have heard something unduly prejudicial to at least one of the parties.
The failure to interview M.B. takes on added significance in light of the juror notes received by the judge during deliberations. While a judge cannot make inquiry into the deliberative process as such, or the mental processes by which a juror reaches his or her decision, State v. LaFera, 42 N.J. 97, 106, 199 A.2d 630 (1964), State v. Kociolek, 20 N.J. 92, 100, 118 A.2d 812 (1955) (involving post-verdict applications), the fact that the jurors reported that M.B. (juror number 8) at first declined to deliberate and that a juror, perhaps M.B., was "in fear of his life," required at least inquiry into whether one or more jurors were concerned about extraneous matters other than the evidence and law as charged by the judge. See State v. Valenzuela, 136 N.J. 458, 643 A.2d 582 (1994); LaFera, supra; Kociolek, supra; State v. Vergilio, 261 N.J.Super. 648, 655-56, 619 A.2d 671 (App.Div.), certif. denied, 133 N.J. 443, 627 A.2d 1147 (1993) (inquiry required of distraught juror who sought to talk with judge).
New Jersey courts have permitted and, indeed, have required voir dire inquiry of jurors, even while deliberating, about the possibility and impact of outside or non-evidentiary extraneous considerations or influences *844 affecting the ability of a juror to be fair and impartial. See State v. Hightower, 146 N.J. 239, 248-49, 265-67, 680 A.2d 649 (1996); State v. Grant, 254 N.J.Super. 571, 580-87, 604 A.2d 147 (App.Div.1992).[3]See also Valenzuela, supra (requiring the court to determine why a juror was unable to continue deliberating); Vergilio, supra (requiring voir dire of distraught juror).
The issue now before us, therefore, is the remedy to be employed when there is doubt about the integrity of the deliberative process, there is an indication that at least one juror may have been affected by outside influences, and the trial judge conducted no inquiry to ascertain whether there were such influences and the reasons therefor.

III.
In State v. Reevey, 159 N.J.Super. 130, 387 A.2d 381 (App.Div.), certif. denied, 79 N.J. 471, 401 A.2d 228 (1978), defendant alleged at trial that one of the jurors was sleeping during summations and instructions. The trial judge took no action. We held this was error, stating that "at the very least under the circumstances of this case the trial judge should have conducted a hearing and questioned this juror as to whether she was in fact dozing or sleeping, or whether she was listening to the summations and the charge but merely had her eyes closed." Id. at 134, 387 A.2d 381. We, therefore, remanded to the trial court with instructions to hold a hearing concerning the allegation that the juror was sleeping during trial. Id. at 135, 387 A.2d 381.
Other appellate courts have also remanded for a hearing following conviction when the trial court had failed to investigate an allegation of juror misconduct or other juror irregularity. In Remmer v. United States, 347 U.S. 227, 228-30, 74 S.Ct. 450, 451, 98 L. Ed. 654, 655-56 (1954), the United States Supreme Court held that the trial court erred in failing to hold a hearing on an allegation that an unnamed person had offered a juror money in exchange for a favorable verdict. The Court stated that such contact or tampering with a juror was presumptively prejudicial but not "conclusive." 347 U.S. at 229, 74 S.Ct. at 451, 98 L. Ed. at 656. The Government was, therefore, permitted to establish, after a hearing, that such contact with the juror was "harmless to the defendant," id. at 229, 74 S.Ct. at 451-52, 98 L. Ed. at 656, and the Court remanded to the trial court for such a hearing.
As the United States Supreme Court later said in a case in which a juror submitted a job application to the prosecutor's office and the prosecutor did not reveal same during the course of trial:
[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer and held in this case.

Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L. Ed.2d 78, 86 (1982) (footnote omitted).
The Supreme Court therefore concluded in Smith that the post-conviction hearing conducted by the state court was adequate to determine that the juror was not biased and the verdict was based exclusively on the evidence. See United States v. Herndon, 156 F.3d 629, 637 (6th Cir.1998) ("remand[ing] the case for a Remmer hearing in which Herndon will have an opportunity to prove actual bias" based on "extraneous" influence on juror).
*845 In United States v. Angulo, 4 F.3d 843, 846 (9th Cir.1993), one juror reported that she received a threatening telephone call in the course of trial and discussed the call with the rest of the jury. The trial judge dismissed the juror who had received the call but refused to question the remaining jurors about possible bias. Id. On appeal, the Ninth Circuit found "the potential for bias is so strong that the judge was obliged at a minimum to hold a hearing," id. at 847, and remanded to the district court "to hold an evidentiary hearing to determine whether the jurors who knew of the threat were able to act impartially and without bias." Id. at 848. The court added that "[t]he government will be required to show that the threatening telephone call was harmless beyond a reasonable doubt to defendants.... If the government cannot make that showing, a new trial should be ordered." Id. at 848 (citation omitted). See also United States v. Barrett, 703 F.2d 1076, 1082-83 (9th Cir.1983).
We recognize that there are problems inherent with a remand almost six years after the verdict. Whether or not M.B. was the juror in "fear," that juror will have to be identified and the impact and effect of what was said to the other jurors will have to be considered in assessing whether defendants received a fair trial. However, the issues now before us were raised during trial and not as a result of post-conviction revelations, see R. 1:16-1; State v. Koedatich, 112 N.J. 225, 286-90, 548 A.2d 939 (1988); State v. Athorn, 46 N.J. 247, 216 A.2d 369, cert. denied, 384 U.S. 962, 86 S.Ct. 1589, 16 L. Ed.2d 674 (1966), and the fact that six years have passed since the verdict was rendered does not by itself prohibit the inquiry. In State v. Marshall, 148 N.J. 89, 690 A.2d 1, cert. denied, ___ U.S. ___, 118 S.Ct. 140, 139 L. Ed.2d 88 (1997), our Supreme Court denied defendant's request for a post-conviction inquiry regarding the existence of extraneous influences on the jury verdict. The Court did so in the absence of sufficient "showing" of such influence and not because seven years had passed since the verdict. 148 N.J. at 280, 690 A.2d 1.
Our Supreme Court has recently reminded us that, in order to "promote the finality of jury verdicts" and "aid the deliberative process itself, allowing each juror the freedom to discuss his or her thoughts," generally "we ought not reconvene the jury that convicted... [a] defendant." State v. Harris, 156 N.J. 122, 154, 716 A.2d 458 (1998). There the issue dealt with the trial court's failure to poll the jury about mid-trial publicity because of its presumption that the jury would follow its prior instructions not to read anything about the case. Id. at 152, 716 A.2d 458. But, independent of the difference between media publicity and whatever gave rise to the juror's concerns in this case, the Harris Court also recognized that jurors can be questioned after trial in "extraordinary" circumstances "when there is a strong representation that a defendant may have been harmed by juror misconduct." Id. at 154, 716 A.2d 458 (citing State v. Koedatich, supra) (which referred to the "extraordinary procedure" based on a "strong showing," 112 N.J. at 291-92, 548 A.2d 939). While here there is no indication a juror disregarded instructions concerning discussing the case or reading about it, the record reflects the real possibility that the juror deliberations were affected by an outside influence. Therefore, the failure to voir dire in the circumstances presented to the trial judge calls for the "extraordinary procedure," Harris, 156 N.J. at 154, 716 A.2d 458, of a remand to interview the jurors.
In State v. Miller, 178 Ariz. 555, 875 P.2d 788 (1994), a dismissed alternate juror left a note on the windshield of one of the remaining jurors, which said either "[h]e's guilty" or "[m]y vote is guilty." Id. at 790. The trial court refused the defense request to take testimony or question the sitting jurors. Ibid. The Arizona Supreme Court held that the trial court abused its discretion in failing to hold an evidentiary hearing. Id. The Court recognized the difficulty of ordering a hearing on this issue almost four years after the original trial, stating:
The arguments against ordering a hearing at this late date are understandable. Memories fade with time. Assuming the jurors can be reassembled, testimony obtained now might be suspect, and its reliability subject to challenge. Moreover, the *846 judge who saw the witnesses and heard the case on its merits has long since retired. Ordering a hearing now will leave another judge who had no involvement in the trial with the difficult task of determining whether the communication prejudiced the verdict.
Id. at 790.
In these circumstances, the court remanded to the trial court "to determine whether a hearing at this late date is feasible. If so, the judge is to proceed with the hearing and make appropriate findings consistent with this opinion. If not, the judge must set aside the verdict and order a new trial." Id. at 793. Accordingly, the Miller court held that "[o]n the remand ..., the trial judge must award a new trial unless the state can prove beyond a reasonable doubt that the contact did not impact the verdict." Id. at 793; see also Remmer v. United States, supra, 347 U.S. at 229, 74 S.Ct. at 451, 98 L. Ed. at 656; United States v. Angulo, supra, 4 F.3d at 848.
Here, the trial judge is still on the bench, and we are satisfied that the mere passage of time should not by itself preclude a remand. We, therefore, conclude that a remand is required for proceedings similar to those in Miller, and that unless the State demonstrates that the jury was not tainted (see Remmer, supra, 347 U.S. at 229, 74 S.Ct. at 451, 98 L. Ed. at 656; State v. Miller, supra, 875 P.2d at 792, n. 2), and that the deliberating jury rendered a decision based exclusively on the evidence, free of taint by improper or extraneous influences, State v. Miller, supra, 875 P.2d at 793, "the trial judge must award a new trial." Ibid.

IV.
If the trial judge grants a new trial, only three other issues raised on this appeal need be addressed by us. Most of the others will become moot by virtue of the new trial and the additional proceedings which can be conducted in advance thereof, or will turn on the actual developments at the new trial. Similarly, issues of severance will have to be reconsidered by the trial judge in light of the acquittals of those not convicted on counts one and two and the charges remaining against them. In essence, we find no basis to preclude retrial on all charges on which the defendants were convicted as we reject the assertions by individual defendants of evidentiary insufficiency of specific counts. State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967); State v. Ball, 268 N.J.Super. 72, 133, 632 A.2d 1222 (App.Div.1993), aff'd, 141 N.J. 142, 661 A.2d 251 (1995), cert. denied sub nom. Mocco v. New Jersey, 516 U.S. 1075, 116 S.Ct. 779, 133 L. Ed.2d 731 (1996).
There are three discrete legal issues, however, which we feel should be settled before another lengthy trial is conducted.

A.
We reject defendants' contention that conspiracy cannot provide a basis, or "predicate act," for racketeering. In this respect we agree with the trial judge's careful analysis, and interpret N.J.S.A. 2C:41-1(a)(1) to include a conspiracy. Federal courts have so interpreted 18 U.S.C.A. § 1961(1)(A), see, e.g., United States v. Echeverri, 854 F.2d 638, 648-49 (3d Cir. 1988); United States v. Benevento, 836 F.2d 60, 72 (2d Cir.1987), cert. denied, 486 U.S. 1043, 108 S.Ct. 2035, 100 L. Ed.2d 620 (1988); United States v. Manzella, 782 F.2d 533, 537 (5th Cir.), cert. denied, 476 U.S. 1123, 106 S.Ct. 1991, 90 L. Ed.2d 672 (1986), and our statute was designed to "cover a broader spectrum of behavior" than the "pattern of racketeering activity" prohibited by the federal RICO Act. See State v. Ball, 141 N.J. 142, 167, 661 A.2d 251 (1995), cert. denied sub nom Mocco v. New Jersey, 516 U.S. 1075, 116 S.Ct. 779, 133 L. Ed.2d 731 (1996). Moreover, our statute, N.J.S.A.2C:41-1a(2), incorporates the federal statute which, by case law, has been interpreted to include conspiracies.

B.
We agree with the trial judge that Judge Donald S. Coburn's role as Essex County Prosecutor in defending the appeal of defendants Bisaccia and Corsaro from a prior conviction and in defending their subsequent federal habeas corpus petition in that matter does not require suppression of the wiretaps *847 he authorized in the subsequent investigation resulting in this indictment.[4] This investigation did not commence while Judge Coburn was still a prosecutor, nor was it conducted by his former office, see State v. Tucker, 264 N.J.Super. 549, 555, 625 A.2d 34 (App.Div. 1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994); State v. McNamara, 212 N.J.Super. 102, 108-09, 514 A.2d 63 (App.Div.1986), certif. denied, 108 N.J. 210, 528 A.2d 30 (1987), and we need not decide if Judge Coburn would be disqualified if he were still County Prosecutor when this investigation commenced or had direct involvement in the prior prosecutions. See Notice to the Bar, "Recusal Policy of the Chief Justice," 134 N.J.L.J. 1030 (September 3, 1996).

C.
Defendant Corsaro had been under investigation for cigarette tax violations and was arrested (and may have been arraigned) for receiving stolen cigarettes before approval was obtained for consensual interceptions by Nicholas DiSabatino of conversations he had with Corsaro. He had counsel at the time. The trial judge ruled that the recordings were not admissible against Corsaro "relative to the theft of the cigarette charge," but were admissible "with respect to other offenses which were uncovered during the conversations between DiSabatino and Corsaro." We agree with the trial judge that recordings of uncounselled statements with respect to unrelated crimes or offenses for which defendant has not been arrested or charged need not be suppressed.[5]See United States v. Kidd, 12 F.3d 30 (4th Cir.1993), cert. denied, 511 U.S. 1059, 114 S.Ct. 1629, 128 L. Ed.2d 352 (1994); United States v. Mitcheltree, 940 F.2d 1329, 1342-43 (10th Cir.1991); United States v. Giovanelli, 747 F.Supp. 875, 885-86 (S.D.N.Y.1989) (confidential informant's recording of defendant on trial for State offenses admissible with respect to later charged federal racketeering charges; defendant had not been charged with racketeering when recordings were made); United States v. Napolitano, 552 F.Supp. 465, 480-81 (S.D.N.Y.1982) (defendant's statements recorded by informant after indictment and conviction on various charges admissible in RICO prosecution when the statements were made before defendant was charged in RICO prosecution);[6]see also State v. Tucker, 137 N.J. 259, 277-78, 645 A.2d 111 (1994), cert. denied, 513 U.S. 1090, 115 S.Ct. 751, 130 L. Ed.2d 651 (1995). We add that while RPC 4.2 has been interpreted and amended since the interceptions in question, it remains clear that it applies in the criminal context only after adversarial proceedings have begun by arrest, complaint or indictment on the charges which are the subject of the communication. The holding of State v. CIBA-GEIGY Corp., 247 N.J.Super. 314, 320-21, 325, 589 A.2d 180 (App.Div.1991), appeal dismissed, 130 N.J. 585, 617 A.2d 1213 (1992), superseded by In re Opinion 668, 134 N.J. 294, 633 A.2d 959 (1993), to this effect has been noted with approval in the commentary to the Report of the Committee which recommended the 1996 amendments to RPC 1.13 and RPC 4.2. See Report of Special Committee on RPC 4.2, 145 N.J.L.J. 318 (1996).[7]See also State v. P.Z., 152 N.J. 86, 116 n. 6, 703 A.2d 901 (1997).

V.
If the trial judge denies a new trial, the defendants may seek to have the appeal reinstated, and we will further consider all the issues raised. Defendants shall also order a transcript of the remand proceedings, and the parties shall advise the Clerk within thirty days of the trial court's order if they *848 desire to file supplemental briefs directed to the remand proceedings.
The matter is remanded to the Law Division for further proceedings consistent with this opinion.
NOTES
[1] Casiere was acquitted of all charges and is not referred to herein.
[2] A recess had been taken in January due to the health of defendant Proto.
[3] In Grant one voir dire occurred during deliberations when a juror indicated she could not be "fair" and one occurred after trial when a juror reported that another juror advised the panel of her husband's professional opinion about the significance of some evidence.
[4] See State v. Stefanelli, 78 N.J. 418, 396 A.2d 1105 (1979); Bisaccia v. Attorney General, 623 F.2d 307 (3d Cir.1980).
[5] The State acknowledges that the ruling would not permit use of the recordings as "evidence against defendant [Corsaro] on the count of conspiracy to commit receiving stolen property, nor on the corresponding predicate acts for racketeering and conspiracy to commit racketeering."
[6] No attorney could ethically counsel defendant with respect to ongoing crimes. See, e.g., In re Nackson, 114 N.J. 527, 555 A.2d 1101 (1989).
[7] State v. CIBA-GEIGY, supra, 247 N.J.Super. at 316, 589 A.2d 180, also noted "the general proposition under existing New Jersey law that evidence obtained in violation of a disciplinary rule need not be suppressed."