771 A.2d 592

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. NICHOLAS DE STEFANO, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 21, 2001—Decided March 23, 2001.

Before STERN, COLLESTER and FALL, JJ.

*Jeffrey L. Weinstein,* Designated Counsel, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney; *Mr. Weinstein,* on the brief).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General, attorney; *Mr. Bonpietro,* of counsel and on the brief).

The opinion of the court was delivered by

STERN, P.J.A.D.

Defendant was charged in seven counts of a seventy-count indictment involving eighteen co-defendants. Defendant and six co-defendants were jointly tried on the first nineteen counts of the severed indictment. The pre trial proceedings commenced in October 1991; jury selection occurred between March and June 1992, and the trial took place from June 1992 until the verdict was returned on March 5, 1993. Counts five and six were dismissed as to defendant during trial, and he was found not guilty on counts

one, two, eight and nine. Defendant was convicted on count four only. That charge had been amended during trial from a conspiracy to commit various offenses, to conspiracy to receive stolen property. He was sentenced to seven years in the custody of the Commissioner of Corrections.

Defendant and his co-defendants raised numerous issues on their direct appeals which were consolidated for purposes of our opinion. In that opinion, we addressed issues raised in common with respect to the claims of jury taint and the jury's consideration of the issues based on extraneous and irrelevant factors. The background with respect to this claim and the present appeal is detailed in our prior opinion, *State v. Bisaccia*, 319 *N.J.Super.* 1, 8–11, 724 *A.*2d 836 (App.Div.1999):

[F]ollowing a report that a juror's car was shot at on the evening of February 16, 1993, the State moved on February 17, 1993, to have the jury sequestered. After granting the motion, the trial judge discharged the juror whose car was shot at and met with the remaining jurors in chambers, outside the presence of defendants and counsel, to discuss the sequestration. At the meeting, juror number 8, M.B., told the judge that he could not "make a fair decision here." The judge made no inquiry as to M.B.'s comment and advised M.B. that he would remain on the jury. At a subsequent meeting the next morning attended by the judge, jury and Court Administrator, M.B. again addressed the judge on the same subject. The record reflects the following exchange:

[M.B.]: As I was trying to say to you yesterday, your Honor, you know, I haven't been to court in some time, I have been on the job, when you are on the job you hear things you don't want to hear, and like I said, I want to make a fair decision, but—

THE COURT: Our purpose in meeting here now is not to go into the merits of the case, that is not our purpose, the purpose of this meeting deals with the problems that arise out of sequestration. Those are the problems.

[M.B.]: Could I meet with you at another time, you and the seven lawyers, then?

THE COURT: We will reserve on that.

At the February 18, 1993 meeting, two jurors also voiced concern about being followed by a man who, according to one of the jurors, was "always in the courtroom." According to the other juror, the man had "approached [him] in the car wash," about two weeks earlier and asked him was "this your kid." The juror reported that he "walked away from" the man.

The transcript of the February 18, 1993 meeting was made available to all counsel the next day. While the proceedings on February 19, 1993, were thereafter devoted to argument regarding former juror M.C., defense counsel also asked to be heard regarding the previous day's *in camera* meeting between the judge and jury and specifically regarding the "[M.B.] issue." The judge declined to hear argument at that time, saying that he would entertain argument on the M.C. matter and would address the M.B. matter in the future.

The next day, Saturday, February 20, 1993, the court announced its decision denying further jury inquiry regarding M.C.'s letter and ordered defense counsel to begin summations. Defense counsel moved for a mistrial on the grounds of the judge's February 18, 1993 meeting with the jurors and M.B.'s statement that he could not be fair and wanted to speak to the judge. The judge refused to hear the motion that day. During the course of this discussion, the judge for the first time told defense counsel about his prior meeting with the jurors on February 17, 1993, and told them that he would make the transcript available to them. Despite defendants' arguments that they were not prepared to present their summations on that day, the summations commenced on February 20, 1993.

During the next few days, at breaks in the summations, defense counsel continued to move for a *voir dire* of juror M.B. and to be heard on other issues regarding the meetings. The judge stated that he would hear these motions after summations were completed. At the conclusion of the prosecutor's summation on March 1, 1993, defense counsel argued that the entire jury should be interrogated regarding the meetings of February 17 and 18, 1993, or, in the alternative, that a mistrial should be declared. The statements of M.B. during the meetings was one of the grounds for these motions. Particularly in light of the fact that defendant Fulco had endeavored in open court on February 20, 1993 to question M.B. directly as to why he could not be fair, the prosecutor conceded in his argument that M.B. should be interviewed. According to the prosecutor:

Obviously, if [M.B.] said that he could [not] be fair, he probably—not probably, he should be interrogated in [*sic* ] especially in light that Mr. Fulco jumped on that Saturday and yelled right at him, [M.B.], come forward. He should be inquired as to whether or not those actions by Mr. Fulco had any—play any part in his ability to be fair. . . .

The judge denied the application to question M.B. The judge stated that he had previously conducted three interrogations of the jury regarding their exposure to mid-trial publicity, and had frequently instructed the jury not to discuss the case with anyone. He presumed the jurors followed his instructions. With regard to M.B., the judge held:

the Court is of the sound view that an insufficient foundation has been established to warrant any further investigation. To entertain a voir dire of this juror and other jurors, based on this colloquy [between the judge and M.B.], would, in my judgment, be one—an application which is unfounded and without any merit.

The judge stated that it was apparent to him based on M.B.'s demeanor, that M.B.'s statements "were motivated [by] nothing other than an attempt to gain the sympathy of the Court relative to the need for his continued confinement as a sequestered juror." He emphasized that M.B. only claimed he could not be fair after he learned that he was to be sequestered.

Subsequently, the State suggested that because of defendants' objections to M.B., he should be "designated as the alternate juror." Defendants objected; they believed that M.B. should be removed from the jury altogether and had possibly tainted the entire jury. The judge denied both requests and the alternate was selected "by random" drawing.

On the second day of deliberations, March 4, 1993, the jury sent out the following note to the trial judge at 3:07 p m.: "we, the jurors, are at a standstill. Juror Number 8 and 9 have determined a certain verdict and [are] not willing to discuss any matter with any of us. We feel that we need someone to intervene so that we can continue our deliberation. Thank you." Most counsel requested that the judge instruct the jury to continue its deliberations. Bisaccia's counsel moved for a mistrial. The judge denied the mistrial motion because he did not believe that the note showed that the jury could not be fair and impartial. However, he reminded the jurors of their obligation to deliberate with each other.

At 6:05 p.m. the same day, the jury sent another note to the judge:

[W]e have a juror that is in fear of his life. He feels he cannot render a fair decision. We have tried numerous attempts at deliberating, to no avail. We would like to know if at all possible the alternate can take his place.

Also, we would like to adjourn for today. Thank you.

The record does not reveal the identity of the juror. The attorneys for defendants Fulco and DeStefano asked that a mistrial be declared on the basis that the juror's remark had "tainted" the entire jury. The other defense counsel requested that the jury be instructed that it must continue to deliberate. In addition, Bisaccia's attorney asked that the jury be interrogated. The prosecutor recommended that the juror in question "be excused from service" because he had indicated that he could not render a verdict based on the evidence.

The judge denied the mistrial motion and the motion to dismiss the juror. He reasoned that the juror's refusal to deliberate was "nothing other than an attempt by a juror to avoid the responsibility of deliberation; to avoid the unpleasantries of sequestration; to attempt to get off the jury...." Instead, he instructed the jury:

Now, I'd like—I'm going to say something to the jury and I'd like all of you to listen to me. Each one of you has taken an oath in this case at the very beginning. Part of that oath is if the occasion warrants deliberations, to deliberate in accordance with the Court's instruction. Deliberate in accordance with the evidence in this case. Plus, I indicated to you yesterday, your verdict cannot be true unless it is strictly and solely in accordance with the evidence. You have a responsibility now and a duty to deliberate.... And I instruct you to continue with your deliberations and you will continue in accordance with the manner that I've instructed you.

[*State v. Bisaccia, supra,* 319 *N.J Super.* at 8–11, 724 A.2d 836 (footnote omitted).]

In our opinion, we directed a remand for an interview of jurors to determine if the jury was tainted by extraneous factors, specifically M.B.'s statement of an inability to be "fair" and a juror's statement of "fear." We indicated that if a new trial was denied, the appeal could be reinstated and that we would review the issues not considered on the direct appeal as well as the remand proceedings. With respect to the remand and the burden thereat, we pointed out that courts in other jurisdictions had, on occasion, endeavored to conduct a necessary *voir dire* even after the jury

had been discharged. 319 *N.J.Super.* at 14–20, 724 *A.*2d 836. In addition, we said the following:

We conclude that the trial judge should have questioned M.B. about his statements that he could no longer be fair, particularly after indicating that during the trial's recess he had heard things he did not want to hear. M.B.'s statement revealed that he may have been exposed to outside information. The jury had recently come back from an almost month long break in the trial. It was at least possible that M.B. may have been exposed to prejudicial information during that time and may have shared that information with other jurors. Moreover, while the judge understood M.B.'s statements may be read to be a mere reaction to sequestration or an effort to get out of jury duty, which in itself required further inquiry, there were other inferences warranting development. Without the judge questioning M.B. about what he meant by his statements, we have no way of knowing what his exposure may have been or how prejudicial that exposure was. As the Court stated in [*State v.*] *Bey, supra,* 112 *N.J.* [45] 89–90 [548 *A.*2d 846 (1988)], without a *voir dire,* "potential prejudice to extremely significant constitutional rights ... might otherwise go wholly undetected." The prior *voir dire* referred to by the judge as a basis for not interviewing M.B. on this occasion all occurred before the January 1993 break and the indication that during the break he may have heard something unduly prejudicial to at least one of the parties.

The failure to interview M.B. takes on added significance in light of the juror notes received by the judge during deliberations. While a judge cannot make inquiry into the deliberative process as such, or the mental processes by which a juror reaches his or her decision, *State v. LaFera,* 42 *N.J.* 97, 106, 199 *A.*2d 630 (1964), *State v. Kociolek,* 20 *N.J.* 92, 100, 118 *A.*2d 812 (1955) (involving post-verdict applications), *the fact that the jurors reported that M.B. (juror number 8) at first declined to deliberate and that a juror, perhaps M.B., was "in fear of his life," required at least inquiry into whether one or more jurors were concerned about extraneous matters other than the evidence and law as charged by the judge. See State v. Valenzuela,* 136 *N.J.* 458, 643 *A.*2d 582 (1994); *LaFera, supra; Kociolek, supra; State v. Vergilio,* 261 *N.J.Super.* 648, 655–56, 619 *A.*2d 671 (App.Div.), *certif. denied,* 133 *N.J.* 443, 627 *A.*2d 1147 (1993) (inquiry required of distraught juror who sought to talk with judge).

New Jersey courts have permitted and, indeed, have required *voir dire* inquiry of jurors, even while deliberating, about the possibility and impact of outside or non-evidentiary extraneous considerations or influences affecting the ability of a juror to be fair and impartial. *See State v. Hightower,* 146 *N.J.* 239, 248–49, 265–67, 680 *A.*2d 649 (1996); *State v. Grant,* 254 *N.J.Super.* 571, 580–87, 604 *A.*2d 147 (App.Div.1992). *See also Valenzuela, supra* (requiring the court to determine why a juror was unable to continue deliberating); *Vergilio, supra* (requiring *voir dire* of distraught juror).

The issue now before us, therefore, is the remedy to be employed when there is doubt about the integrity of the deliberative process, there is an indication that at least one juror may have been affected by outside influences, and the trial judge conducted no inquiry to ascertain whether there were such influences and the reasons therefor.

. . . .

We recognize that there are problems inherent with a remand almost six years after the verdict. *Whether or not M.B. was the juror in "fear," that juror will have to be identified and the impact and effect of what was said to the other jurors will have to be considered in assessing whether defendants received a fair trial.* However, the issues now before us were raised during trial and not as a result of post-conviction revelations, *see R.* 1:16–1; *State v. Koedatich,* 112 *N.J.* 225, 286–90, 548 *A.*2d 939 (1988); *State v. Athorn,* 46 *N.J.* 247, 216 *A.*2d 369, *cert. denied,* 384 *U.S.* 962, 86 *S.Ct.* 1589, 16 *L.Ed.*2d 674 (1966), and the fact that six years have passed since the verdict was rendered does not by itself prohibit the inquiry. In *State v. Marshall,* 148 *N.J.* 89, 690 *A.*2d 1, *cert. denied,* 522 *U.S.* 850, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997), our Supreme Court denied defendant's request for a post-conviction inquiry regarding the existence of extraneous influences on the jury verdict. The Court did so in the absence of sufficient "showing" of such influence and not because seven years had passed since the verdict. 148 *N.J.* at 280, 690 *A.*2d 1.

Our Supreme Court has recently reminded us that, in order to "promote the finality of jury verdicts" and "aid the deliberative process itself, allowing each juror the freedom to discuss his or her thoughts," generally "we ought not reconvene the jury that convicted . . . [a] defendant." *State v. Harris,* 156 *N.J.* 122, 154, 716 *A.*2d 458 (1998). There the issue dealt with the trial court's failure to poll the jury about mid-trial publicity because of its presumption that the jury would follow its prior instructions not to read anything about the case. *Id.* at 152, 716 *A.*2d 458. But, independent of the difference between media publicity and whatever gave rise to the juror's concerns in this case, the *Harris* Court also recognized that jurors can be questioned after trial in "extraordinary" circumstances "when there is a strong representation that a defendant may have been harmed by juror misconduct." *Id.* at 154, 716 *A.*2d 458 (citing *State v. Koedatich, supra*) (which referred to the "extraordinary procedure" based on a "strong showing," 112 *N.J.* at 291–92, 548 *A.*2d 939). While here there is no indication a juror disregarded instructions concerning discussing the case or reading about it, the record reflects the real possibility that the juror deliberations were affected by an outside influence. Therefore, the failure to *voir dire* in the circumstances presented to the trial judge calls for the "extraordinary procedure," *Harris, [supra,]* 156 *N.J.* at 154, 716 *A.*2d 458, of a remand to interview the jurors.

In *State v. Miller,* 178 *Ariz.* 555, 875 *P.*2d 788 (1994), a dismissed alternate juror left a note on the windshield of one of the remaining jurors, which said either "[h]e's guilty" or "[m]y vote is guilty." *Id.* at 790. The trial court refused the defense request to take testimony or question the sitting jurors. *Ibid.* The Arizona Supreme Court held that the trial court abused its discretion in failing to hold an evidentiary hearing. *Id.* The Court recognized the difficulty of ordering a hearing on this issue almost four years after the original trial, stating:

The arguments against ordering a hearing at this late date are understandable. Memories fade with time. Assuming the jurors can be reassembled, testimony obtained now might be suspect, and its reliability subject to challenge. Moreover, the judge who saw the witnesses and heard the case on its merits has long since retired. Ordering a hearing now will leave another judge who had no

involvement in the trial with the difficult task of determining whether the communication prejudiced the verdict.

[*Id.* at 790 (footnote omitted; emphasis added).]

In these circumstances, the court remanded to the trial court "to determine whether a hearing at this late date is feasible. If so, the judge is to proceed with the hearing and make appropriate findings consistent with this opinion. If not, the judge must set aside the verdict and order a new trial." *Id.* at 793. Accordingly, the *Miller* court held that *"[o]n the remand . . ., the trial judge must award a new trial unless the state can prove beyond a reasonable doubt that the contact did not impact the verdict."* *Id.* at 793; *see also Remmer v. United States, supra,* 347 *U.S.* at 229, 74 *S.Ct.* at 451, 98 *L.Ed.* at 656; *United States v. Angulo, supra,* 4 *F.*3d at 848.

Here, the trial judge is still on the bench, and we are satisfied that the mere passage of time should not by itself preclude a remand. We, therefore, conclude that a remand is required for proceedings similar to those in *Miller,* and that *unless the State demonstrates that the jury was not tainted (see Remmer, supra,* 347 *U.S.* at 229, 74 *S.Ct.* at 451, 98 *L.Ed.* at 656; *State v. Miller, supra,* 875 *P.*2d at 792, n. 2), and that the deliberating jury rendered a decision based exclusively on the evidence, free of taint by improper or extraneous influences, State v. Miller, supra,* 875 *P.*2d at 793, *"the trial judge must award a new trial."* Ibid.

[*State v. Bisaccia, supra,* 319 *N.J.Super.* at 14–20, 724 *A.*2d 836 (footnote omitted; emphasis added).]

Despite the fact that our opinion was filed on March 2, 1999, the remand proceedings, which involved the interview of only two jurors, were not concluded until October of that year. We are told by the State that the delay was partially caused by the negotiated guilty pleas of all of the defendants involved on the appeal, except for this defendant and co-defendant Louis Fulco. The negotiated disposition avoided the risk to defendants of an affirmance and to the State of a lengthy retrial of a complicated case which would be almost a decade old by the time the matter could be retried following resolution of the appeal after the remand was completed.

During the remand, only M.B. and the jury foreperson were interviewed. Thereafter the trial judge denied defendant's request to interview the remaining jurors. On this appeal defendant claims that the trial judge improperly denied a new trial and, in any event, denied his request to interview all the jurors. He also asks us to consider all remaining issues raised on the direct appeal if we affirm the denial of a new trial.

At the remand hearing, the trial judge questioned M.B. regarding his jury service. He asked M.B. about the February 17, 1993, meeting between the judge and the jury regarding sequestration and M.B.'s statement that he could not be fair. M.B. stated that "if [he] said it, it probably was something out of frustration" because he was "really upset" that he had been sequestered and "figured" that if he claimed he could not be fair, he would be excused from the jury.

The judge also asked M.B. about the February 18, 1993, meeting in which he said that he had heard things on the job that he did not want to hear. M.B. held two jobs at the time of his jury service, one as a custodian for the Newark Board of Education and the other as a boiler operator for the Newark Housing Authority. He testified that, in light of the jury instructions, when any of his coworkers began to discuss the trial, he "would get up and walk away." He explained that he made the remark about having heard things because he was upset about being sequestered at a time when his "mother was sick," and he was having a "medical problem" of his own. M.B. stated that he asked to meet with the judge and the seven lawyers because "[he] was going to just try to get a point across [he] really didn't want to serve on the jury." M.B. also said he could not recall the incident in which defendant Fulco addressed him directly.

M.B. was juror number eight. With regard to the jury's note during deliberations that jurors eight and nine refused to deliberate, M.B. testified that he had no recollection of having made up his mind and refusing to deliberate with the other jurors.

The judge also questioned M.B. about the jury note stating that one juror was in fear of his life and requesting that an alternate take his place. M.B. responded, "[i]t could have been some misunderstanding." He explained that some of the jurors thought the "process was moving too slow" and so they thought that M.B. or the other discontented juror could be replaced by the alternate. M.B. did not recall telling the foreperson or the other jurors that he was in fear of his life. He said he believed the judge when he

told him that he had nothing to fear. Later in his testimony, M.B. stated:

> The only thing I can really recall, your Honor, maybe somebody on that jury said to a few people, what's wrong, we [are] moving too slow, anybody scared or fear for their life, or something. I couldn't—maybe somebody misread into it. If I did say it, I didn't in particular mean anything by it.

When questioned further, M.B. again said that he could not recall saying that he was in fear for his life. M.B. did testify, however, that one juror was taken off the jury because she was in fear of her life:

> THE COURT: Do you recall having been told anything by any other juror that indicated or suggested that that juror may have been in fear of his or her life?
>
> [M.B.]: I think earlier on, it was one person.
>
> THE COURT: You're saying "early on." You mean when?
>
> [M.B.]: During the trial.
>
> THE COURT: During the trial, or during the deliberations?
>
> [M.B.]: One person was pulled off I recall.
>
> THE COURT: Yeah.
>
> [M.B.]: You know, she could have been scared or something. You want me to recall the name?
>
> THE COURT: Well, what do you recall about that? Tell us about that.
>
> [M.B.]: I heard somebody say maybe [L.T.] didn't want to come back to court because of an incident, you know, with a car, incident or something. You know, from that point on, I never seen her anymore on the trial.

M.B. further testified that N.G. and another juror were talking, "and ... they say something happened to [L.T.'s] car" and "she got scared to come back to court or something, they going to take her off the case."

Finally, the judge asked M.B. this series of questions:

> THE COURT: Okay. Is there anything you may have read in the newspapers or anything you may have heard, whether it be on the job or otherwise, which puts you in fear of your life?
>
> [M.B.]: No, your Honor.
>
> THE COURT: So anything that you may have read in the newspapers, anything you may have heard, or anything that was communicated to you by others, whether it be on the job or otherwise, which interfered with your ability to be entirely fair?
>
> [M.B.]: No.
>
> THE COURT: Were you fair in this case?
>
> [M.B.]: Yes, I was very fair, your Honor.

THE COURT: Did anybody influence or intimidate you in any way to reach a verdict you did not feel was entirely fair?

[M.B.]: No, they did not.

THE COURT: ... Were you able to decide the case fairly, based soled [sic] on the evidence that was presented at the trial?

[M.B.]: Yes, your Honor.

THE COURT: Was your decision influenced at all by any communication made to you by any other juror regarding outside factors such as newspaper articles or information about the case that that other juror had learned from some other source? Do you recall anything of that kind?

[M.B.]: No, your Honor, no.

The jury foreperson, J.P., also testified at the remand hearing. He recalled that he sent out the first jury note because juror eight, whom J.P. identified as M.B., and juror nine, whom J.P. could not identify, "had a certain verdict made up in their mind[s], and they weren't willing to go over the evidence that was presented to us." But J.P. had no recollection as to whether M.B. did deliberate after this note.

Regarding the second jury note, J.P. identified the juror who was in fear of his life as M.B. According to J.P., "[t]he reason he stated [that] he was in fear of his life, because he said the defendants all were mobsters, and he feel as though they would retaliate in some form or another" and that "he [felt] they would retaliate against him and his family if he rendered a guilty verdict." M.B. did not indicate that any threats had been made against him or his family or that he "heard something on the outside" that put him in fear. When the judge again asked J.P. if M.B. had given any reason for his fear of retaliation, J.P. stated "[n]o, other than what was going on during the trial, other than that, no, he didn't give us any reason." [1] The following colloquy then developed:

THE COURT: Was the fact that the defendants were all Mafia, was that something that was new or something you already knew at that point in time?

---

[1] The judge did not ask J.P. what he understood the phrase "what was going on during the trial" to mean or if J.P. understood it to refer exclusively to the evidence.

[J.P.]: I didn't hear you.

THE COURT: In other words, the fact he said the defendants were all Mafia, was that something, in your case, was that a statement of some new information, or was that something you were aware of at that time?

[J.P]: A new statement.

THE COURT: A new statement?

[J.P.]: Right.

THE COURT: You never knew they were Mafia?

[J.P.]: No.

THE COURT: When [M.B.] made the statement he was in fear of retaliation in the presence of other jurors, was there any other comment or reaction by any other jurors to that particular comment?

[J.P.]: Not that I can recall.[2]

J.P. did remember that M.B. expressed his dissatisfaction in being sequestered. J.P. stated that M.B. was "very uncomfortable about being sequestered. I remember all of us were uncomfortable with it, but among all of us, he kind of stood out, so to speak, as far as being the most uncomfortable one in the group."

The trial judge announced his decision on October 8, 1999, about ten days after the interviews. Based on the information he obtained at the hearing, the judge was "satisfied beyond a reasonable doubt that there was no prejudicial outside influence, no extraneous matter, no information brought to the attention of . . . M.B. or any other juror . . . with a sufficient capacity to taint or to compromise the return of a fair and impartial verdict in the matter." Specifically, the judge found beyond a reasonable doubt that M.B. had not been given any prejudicial information while he was at work or at any other time. He also found beyond a reasonable doubt that M.B. was the juror who the second jury note referred to as being in fear of his life, but that, in fact, M.B. was not in fear. The judge concluded that M.B. made the statements in order to avoid sequestration. The judge also found that there was no basis to conclude that M.B. shared any prejudicial information with his fellow jurors.

---

[2] The word "Mafia" was actually first used by the judge after J.P. indicated that M.B. had used the word "mobsters."

Regarding J.P.'s allegation that M.B. told the other jurors that defendants were mobsters who were going to retaliate against the jurors and their families, the judge assumed that M.B. had made the statement. The judge noted that it was essential to the State's case to prove that defendants were part of the Gambino organized crime family headed by John Gotti. He also found the theme of retaliation against perceived rivals and enemies was part of the State's case against defendants. The judge therefore concluded that M.B.'s characterization of defendants as mobsters who might retaliate was not the result of outside prejudicial information, "but rather a fair and reasonable assessment on their [the jurors'] part of the entirety of the proofs."

The judge determined that nothing in the remand hearing would warrant a conclusion that M.B.'s statement influenced the jury to reach a verdict inconsistent with the proofs and the judge's instructions. Accordingly, the judge denied defendants' application for a new trial.

It is clear to us that the State did not satisfy its burden as required by our original opinion. 319 *N.J.Super.* at 19–20, 724 *A.*2d 836. This flows from a number of facts developed on the remand. Among other things, it became clear that at least some jurors discussed, to some degree, the discharge of juror L.T. and that it had something to do with her car. Secondly, we learned that, despite M.B.'s recollection to the contrary, the foreperson believed M.B. was the juror who was in fear of retaliation during the deliberations, and M.B. was juror number eight, one of the two jurors criticized during the deliberations for refusing to deliberate. Thirdly, the foreperson acknowledged, irrespective of the proofs at trial, that M.B.'s comments made him realize something that he had not understood from the evidence.

We appreciate that the State's case was premised on organized criminal activity, and that there was evidence relating defendants to the Gambino crime family and John Gotti. We further recognize that a true "fear of retaliation" might lead a juror to vote for acquittal, as opposed to conviction. However, we cannot speculate

as to the impact of M.B.'s words, including the impact thereof on other jurors who voted to convict defendant on a count involving an organized criminal conspiracy. More importantly, this record is absolutely barren of any evidence with respect to the impact, or lack of impact, of M.B.'s comments, or discussion regarding the excuse of a juror whose car was shot at, on the ten other jurors who were not interviewed at the remand proceedings.

We did not expressly order in our prior opinion that all deliberating jurors be called at the remand hearing. It should be obvious that all might not be available over six years post discharge. However, we did not suggest that those who were available should not be called, particularly once it became clear that remarks concerning extraneous factors were stated in the jury room. The fact is that the other jurors were not called, and the judge did not require that they be called. The State did not request that they be called and, in any event, the State could not sustain its burden in these circumstances at least without calling them.

■ At the oral argument before us, we explored whether we should remand again to continue the interview process. To the extent the State now suggests that we should remand again to continue the *voir dire*, we conclude that the circumstances are now different than they were two years ago when we initially ordered the remand. Among other things, the remand proceedings, which were themselves extraordinary, reflect that memories in 1999 were less than desirable. The matter is now nine years post trial, and the State did not seek to interview further jurors when it had the opportunity to do so. Moreover, while it may not be relevant to the decision now before us, we add that defendant was convicted on count four only and that the single charge can be retried, if the State elects to do so, in relatively short order, whether or not defendant is retried with co-defendant Fulco who was convicted only on counts four and seven.

■ Our disposition renders moot the need to decide the other issues we did not address on the direct appeal. We perceive that no remaining issue raised by defendant on the direct appeal need

be addressed in light of the reversal of his conviction. However, if the State elects to retry defendant at this time, after he has completely served his sentence, in order to preserve the judgment of conviction or monetary assessments, we recognize that it may utilize the transcripts of testimony from the prior trial because the State's witnesses may be unavailable and were subject to cross-examination at the first trial. *Mancusi v. Stubbs*, 408 *U.S.* 204, 213–14, 92 *S.Ct.* 2308, 2313, 33 *L.Ed.*2d 293, 301–02 (1972); *State v. Laws*, 51 *N.J.* 494, 548, 242 *A.*2d 333, *cert. denied*, 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968). In light of that fact, if the State desires to utilize the transcripts of Detective Smith and/or Deputy Chief Buccino in lieu of live testimony, and either party believes that review of any evidentiary ruling or issue raised on the direct appeal is warranted before the retrial, we will entertain an application for such review. To that end, should the State elect to retry the defendant, the decision with respect to the use of the transcripts, and any issue raised with respect thereto, shall be considered at a pretrial hearing which the judge is ordered to conduct. *See R.* 3:9–1(d),(e).

Finally, we have already ruled, in anticipation of a new trial, on other issues regarding the admissibility of evidence, including wiretap interceptions which the State may or may not offer in connection with the conspiracy as alleged in count four. *See Bisaccia, supra*, 319 *N.J.Super.* at 21, 724 *A.*2d 836. Given what is left to retry, we leave to the trial judge to decide what interceptions, if offered as relevant to count four, may be admitted in the context of what is being retried.

The judgment of conviction is reversed, and the matter is remanded for further proceedings consistent with this opinion.