75 N.J. Super. 1 (1962)
182 A.2d 129
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALBERT TASSIELLO, JAMES HAGAN, AND JAMES H. HAYES, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 13, 1962.
Decided May 14, 1962.
*3 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Nino D. Caridi argued the cause for appellants.
Mr. William C. Brudnick, Special Assistant Prosecutor, argued the cause for respondent (Mr. Guy W. Calissi, Bergen County Prosecutor, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
This is an appeal from judgments of conviction entered in the Bergen County Court on jury verdicts. The defendants were indicted for breaking and entering with intent to steal (N.J.S. 2A:94-1), and also for conspiracy to commit that crime (N.J.S. 2A:98-1). All three defendants were found guilty of the conspiracy charge; Tassiello and Hagan were also found guilty on the breaking and entering indictment; Hayes was acquitted of this charge.
Defendants attack the convictions upon the grounds that (1) the State failed to make out a prima facie case of guilt of the offenses charged; (2) the court erred in failing to exclude from the evidence two confessions of the defendant Hayes, and (3) the cross-examination of Hayes concerning prior convictions of crime was improper and prejudicial.

*4 I.
The test on a motion of a defendant for a judgment of acquittal is whether there is any legal evidence before the jury from which an inference of guilt can be legitimately drawn. State v. Rogers, 19 N.J. 218, 231-232 (1955); State v. Picciotti, 12 N.J. 205 (1953); State v. Bricker, 99 N.J.L. 521 (E. & A. 1924). In a circumstantial evidence case the inquiry is whether the evidence is of sufficient quality to convince a jury beyond reasonable doubt of the defendant's guilt. State v. Dancyger, 29 N.J. 76, 84 (1959). Therefore, the question before the trial court at the close of the State's case was whether the evidence viewed in its entirety and giving the State the benefit of all legitimate inferences therefrom, was such that the jury could properly find beyond a reasonable doubt that the defendants were guilty of the crimes charged. Id.
The State offered the following evidence: On September 8, 1960, at about 11 P.M., the defendants became patrons of Seidel's Restaurant and took seats at the bar. They were served beer by the bartender, Robert Davies; according to Davies, "they didn't drink very fast. Let's say about four beers in an hour." At about 2 A.M. they left. Davies closed the establishment at that time and "walked right out behind them." He locked up everything, put out all of the lights except one, and as he walked out, snapped the lock on the front door. He saw the three men drive off in an automobile.
At about 2:10 A.M. Officer Richard J. Stoltenburg, a member of the Ridgefield Police Department, while operating a patrol car on his tour of duty noticed a man, who proved to be Tassiello, enter the side door of the restaurant. The officer immediately backed his car into an adjacent parking lot, got out and tried the side door. It was locked. Stoltenburg then went to the rear of the premises where he found another man, later identified as the defendant James Hayes, sitting on a pail. In response to a query *5 by the officer, Hayes explained that he was answering a call of nature. The officer observed that the pail was a mop pail, that Hayes' trousers were up, and that he was merely sitting on the pail. He placed Hayes under arrest, brought him back to the police car and handcuffed him to a door of the car. He then radioed police headquarters for assistance. In response, Patrolman Vincent P. Amicosante joined Stoltenburg at the scene. Amicosante then guarded the front door of the premises while Stoltenburg knocked on the side door. Presently, Stoltenburg went to the front door, which was also locked, and both officers "banged" on the door, identifying themselves and demanding that the person or persons within open the door. Hagan finally came to the door and opened it. Stoltenburg pulled him out and "frisked" him. Stoltenburg then entered the premises and found Tassiello "slouched down" in a booth in a crouched position. He placed him under arrest. Stoltenburg then walked the three men to police headquarters, which was a short distance away, leaving Amicosante at the restaurant. Later, Stoltenburg returned to the scene, relieved Amicosante, who went back on patrol, and then conducted a preliminary investigation.
His examination of the premises revealed that a window was open in the men's room. On further investigation he found an automobile about one block north of the premises which was registered in Hayes' name.
The State offered no evidence from which it could be inferred that the defendants or any of them had committed a theft while in the restaurant premises.
The thesis offered by defendants in support of their contention that the foregoing proofs were insufficient to support the indictments is that no legitimate inference of a "breaking" could be drawn therefrom, and that there was absent evidence that Hagan and Tassiello entered the premises with intent to steal. As to the first point, it is noted that the statute interdicts both breaking and entering, and entering without breaking, provided that felonious *6 intent is present. Thus, the gist of the crime is the evil intent to steal rather than the particular means by which it is perpetrated. Similarly, the gist of the offense of conspiracy is the unlawful confederation and not necessarily the overt acts designed to carry it into effect. State v. Vanderhave, 47 N.J. Super. 483 (App. Div. 1957), affirmed 27 N.J. 313 (1958).
More often than not intent is determined by the appraisal of human actions in light of the circumstances in which they take place. Disregarding completely statements later given by the defendants to the police concerning the occurrences described in the State's proofs, it is clear to us that the composite of the State's proofs required jury determination of the issues presented. Plainly, the inferences to be drawn from the evidence that the defendants returned to the locked and darkened restaurant within minutes after they had left it, and, knowing it to be unattended, then entered it by breaking or otherwise, are inconsistent with lawful conduct. When there was added to this the fact that one man was stationed outside while another entered an open door which had been previously locked, it became legitimately inferable in support of both charges that the role of the former was that of a lookout and that the latter man was admitted by someone already in the building. When, finally, the open window is considered and it is noted that the men inside behind locked doors did not readily respond to the demands of the police that they be admitted, and that upon entering the premises the police found one of them attempting to hide himself from their view, a picture emerges from the totality of proofs which completely justified denial of the motion for acquittal at the end of the State's case.

II.
As the trial of the case developed, the admissibility of statements given to the police by the defendants, with particular *7 reference to the circumstances in which they were given, became a bitterly contested issue; and when the case was finally presented to the jury, the summations of respective counsel were devoted almost entirely to a discussion of this issue. Tersely stated, it was contended by the defendants that the statements were coerced by the brutality of the arresting officers Stoltenburg and Amicosante, and others. This was categorically denied by both Stoltenburg and Amicosante.
A brief resume of the procedure taken by the trial court and of the testimony on this subject additional to the vigorous denials by the officers follows: In the course of the State's case Officer Edward F. Gallagher, assistant in charge of the records and identification bureau of the Ridgefield Police Department, was called as a witness by the State. He testified that on September 9 starting at about 7:30 A.M. he interviewed, successively, Hayes, Hagan and Tassiello at the police headquarters. This apparently was undertaken at the commencement of his tour of duty for the day and he had had no contact with the men during the prior hours in which they were in custody. The purpose of his testimony was to lay the foundation for admitting into evidence an alleged confession taken by him in question and answer form from Hagan and marked S-1 for identification, and two confessions taken from Hayes, one in Hayes' own handwriting and the other in question and answer form, marked S-3 and S-4.
It appears that at this point the voluntariness of these confessions was contested by defense counsel. The trial court proceeded to conduct a preliminary hearing on this issue in the absence of the jury. An unsigned statement attributed to Tassiello was not involved in this inquiry. This statement, entirely exculpatory in content, was offered by the State and initially objected to, but subsequently the objection was withdrawn and it was received in evidence on the offer of defense counsel and read to the jury by him.
The direct testimony of Gallagher on the issue of voluntariness went no further than to show that the statements *8 given by Hagan and Hayes to him or in his presence were voluntarily given and that at that time no unusual circumstances were present. The cross-examination of this officer did not establish to the contrary although the questioning was replete with suggestions of coercive conduct on the part of the police. At the conclusion of the examination of Officer Gallagher defense counsel did not offer to contest the voluntariness of the statements.
Thereupon the trial court announced that the statement of Hagan and the two statements of Hayes would be received in evidence, and the jury was recalled. This done, the statements were admitted in evidence, and Officer Gallagher was again cross-examined by defense counsel, after which the Prosecutor was permitted to read to the jury the three statements. Without going into detail it suffices to say that taken singly or in combination the statements fleshed out the circumstantial nature of the State's case, and if taken as true, proved beyond question the guilt of all defendants on both the charges of conspiracy and breaking and entering with intent to steal.
It was not until the defense opened that the voluntariness of the statements of Hayes and Hagan was affirmatively contested by them. Hayes testified that upon their arrival at the police station he complied with a direction to empty his pockets and to take his shoes and belt off, after which he was handcuffed to a bench where he sat for about two hours. During this time he could hear Hagan and Tassiello "screaming down in the cellar." After about an hour he was questioned about certain construction tools which had been found in his car, and then again handcuffed to the bench. Shortly thereafter Tassiello was brought up from the cellar and placed in a cell. Hagan was then taken downstairs and he could hear Hagan "screaming for about an hour and a half." Sometime during this period Patrolman Amicosante came up to him and said, "You are going to get it for being a wise guy," and also, "You are going to get it next." Amicosante then returned to the cellar. *9 About 15 minutes later Amicosante came upstairs, removed the handcuffs, and took him to the "cellar." As they got to the stairway (a flight of 30 steps) Amicosante "pushed" him or "threw" him down. He landed on his feet and struck a wall. He was then fingerprinted and photographed. After this, said Hayes, he was physically beaten, punched and kicked about the body, and his private parts were held by one patrolman while others pulled him from another direction. After being asked whether he had sexual relations he was told that he would be "half a man" when he got out. He was ordered to write a statement and when he said that his hand hurt an officer "started tapping on [his] head" with a blackjack. He testified further that a statement was then dictated to him and that he wrote it in his own hand. This was the handwritten "confession" which was received as exhibit S-4. A question and answer "confession" (S-3 in evidence) was also taken of Hayes. He said that everytime he gave an answer which was unsatisfactory he was clubbed by Patrolman Stoltenburg. Hayes also testified that when Hagan passed him at one time his entire face was covered with blood.
Hayes' trousers with the crotch portion torn were introduced into evidence over the prosecutor's objection.
Hagan testified that his shoes were removed, he heard Tassiello screaming, he was subsequently taken downstairs and there were five men present including Stoltenburg and Amicosante. He said that when he was questioned he told the police officer that he had fallen asleep in Seidel's, and that he opened the door when he heard Tassiello knock, and merely went back to find his shoe. He was spat in the face by Patrolman Stoltenburg and told that he had "robbed that place." Upon denying this he was kicked and punched and "spreadeagled." To prove that he was telling the truth Hagan offered to take a lie-detector test. Officer Stoltenburg halted the "Captain," whispered in his ear, and brought Hagan back again and administered a further beating. He was bleeding at the nose. Hagan said *10 he was told that he was being given a "breather" while they would "work" on his partner, and he was returned to his cell.
Subsequently, on being brought back Hagan testified further that he was shown the statement of Hayes and told to read it aloud. He was told that they now wanted a statement from him. When he refused Stoltenburg stepped on his bare foot and hit him in the "gut." He began bleeding again and was nauseous; he had broken into a cold sweat and was going to "pass out." He claimed that it was under these circumstances that he signed the "confession." He said: "I was broken, I didn't care any more. I didn't care for nothing. I didn't know what to do. I felt like I was dead then. Then I wasn't there anymore."
Tassiello testified that he also had been beaten and kicked by the police. He was not asked to go into the same detail on this subject as were Hayes and Hagan possibly because, as we have noted, he did not challenge the voluntariness of his statement. Although the admissibility of Tassiello's statement was not in issue, his testimony concerning mistreatment of him by the police becomes relevant for our purposes only as it may bear on the charges of Hayes and Hagan that their statements were induced by police brutality.
Tassiello testified that he had a bruise on his right shoulder and pains in his chest as a result of being kicked; and that he complained of these injuries to the prison physician, Dr. Michael Sarla.
Doctor Sarla testified that Tassiello and Hagan were referred to him for examination at the infirmary of the county jail on September 12; that Tassiello "said that he had pain in the lower right chest and upper right shoulder. That was four days duration since he had been beaten up"; and that Hagan came to him because of pain in the chest and shoulder and left knee and also of four days' duration and also following a "beating up." The doctor said also that he did not examine Hayes until September 16, at which *11 time his "statement was that he also had been beaten up. He had no particular complaint other than the fact that he had some frequency of urination."
On September 16 Doctor Sarla referred Tassiello and Hagan to the Bergen Pines Hospital for X-ray. The report of the hospital to the doctor was that the examination of Tassiello revealed "a fracture of the tenth rib" of the right rib cage "in the anterior axillary line," and that there was "no significant separation of the fractured fragments." Evidently the X-ray of Hagan, if one was taken, was negative for fracture, as Doctor Sarla said that while Hagan had "several black and blue marks on his chest and showed a discoloration," there was no evidence of any fractured ribs. The doctor went on to say that he had Tassiello under his care until he was released from custody on bail on November 22, and that he gave him medical care on ten occasions during the period of his confinement. He also administered treatment to Hagan from time to time.
The State called in rebuttal Captain John T. Gallagher. He stated that he had been on duty from approximately 2:45 A.M. until 11:30 A.M. on September 9; that he was in charge of the investigation of the alleged crime; and that as senior officer he was also in charge of, and responsible for, all subordinates on duty at the time. He denied explicitly that he had seen any officer strike, hit, kick or otherwise inflict any physical punishment on any of the three defendants, and said that none had made any complaint to him of mistreatment. On cross-examination it developed that the first time the officer had seen the defendants was between 4:00 and 4:30 A.M. The State offered tangential proof through the warden and two employees of the Bergen County jail to the effect that when the defendants were received at the jail on September 9 at 8 P.M. following the arraignment, no abnormalities suggesting that they had been subjected to physical violence were noted. The State also offered in evidence photographs of the defendants which were taken on the morning of *12 September 9 for the same purpose. However, since the injuries which defendants claim to have suffered were to parts of the body other than those which would be casually observed, or disclosed by the photographs, these proofs were of little value.
When the entire case was closed, defense counsel moved that the statements of Hagan and Hayes be stricken from the evidence on the ground that they were not voluntarily given but were induced by coercion and physical violence. We note that at the very commencement of the colloquy upon this motion the trial court addressing defense counsel stated:
"Let's confine ourselves with each one.
Tell me where the evidence is preponderant that Hayes was `beaten up' by the police." (Emphasis ours)
We italicize "preponderant," because if the trial judge intended to use this word, it may be that the action thereafter taken by the judge was based upon a misconception of the law. As basic in the criminal law as the rule of reasonable doubt is the principle that the burden rests upon the State to prove the voluntariness of a confession before it may be admitted in evidence. See State v. Tune, 13 N.J. 203, 215 (1953). Thus, the court in passing on this question was required to determine whether the evidence was "preponderant" that Hayes was not "beaten up" rather than the reverse of the proposition. Cf. State v. Bowden, 62 N.J. Super. 339, 360 (App. Div. 1960), certif. denied 33 N.J. 385 (1960). At the conclusion of a lengthy argument, all of which, of course, was out of the presence of the jury, the motion to strike the two statements of Hayes, S-3 and S-4, was denied.
The motion directed to Hagan's statement was then argued. In granting this motion the court said:
"With reference to Hagan, I don't like police brutality. I think it is abominable and un-American. I am not here to determine the *13 innocence or guilt of any of these three defendants, but I am here to pass upon the legal sufficiency or the legality of any evidence, but with respect to the purported admissions of Hagan's statement in evidence which has been marked by the State as S-1 in evidence, the court has determined to reject the same and to strike it from the record."
The plain implication of this ruling by the trial judge is that he found that Hagan's charges of brutality were sustained by the evidence, hence the State had not proved the statement to have been voluntarily given. Necessarily this meant that the judge disbelieved the sworn avowal of Officers Stoltenburg and Amicosante that no physical violence had been practiced on Hagan.
It is true, as was observed in State v. Bowden, supra, that the mere fact that the confession of one of two or more defendants was the product of police brutality does not, in and of itself, create the inference that a confession obtained from a codefendant was likewise induced by violence. Quite properly it was pointed out in Bowden that the testimony in that case which was given by a doctor and was supportive of Bowden's claim of coercion, negated the claim of the codefendant, and that the facts concerning the length of confinement of the two men before the confessions were obtained were different. Moreover, the court noted that issues of the defendants' credibility were present which might have been determined in favor of one, and not of the other.
Except, possibly, for the ever-present question of credibility, we find nothing in this record which indicates the slightest difference in the position of any of the three defendants, vis-a-vis the arresting officers. The officers did not say that Hagan was less cooperative than Hayes, more truculent than Hayes, or that he displayed any attitude which required sterner treatment of him than was necessary in order to obtain a voluntary confession from Hayes. Nor did the officers ascribe to Tassiello any word or action which inferably might have precipitated treatment resulting in the *14 unaccounted for broken rib he was found to have sustained. On the contrary, insofar as the defendants were concerned they were as three peas in a pod according to the evidence.
It is quite conceivable that the trial court found Hayes' credibility to be less impressive than Hagan's. Certainly it was within the province of the judge to conclude that Hayes' account of the mistreatment visited upon him was an exaggerated one. Yet, if it be the fact that he was subjected to violence, and as a result there was extorted from him a confession he would not have made of his own free will, in the protection of the judicial process, public policy requires that such a confession should not be used in aid of a conviction. This is emphasized in State v. Smith, supra, where the court, in quoting from Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), said:
"* * * in cases involving involuntary confessions this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. This insistence upon putting the Government to the task of proving guilt by means other than inquisition was engendered by historical abuses which are quite familiar. * * *
The abhorrence of society to the use of involuntary confessions * * * also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. * * * Thus, a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case."
And in Smith, supra, Mr. Justice Hall in these strong terms defined the role of an appellate court in reviewing a confession:
"We must ever be alert, however, that recognition [of rulings on confessions] is not mere lip service. Review has to be both wide *15 and penetrating to make sure that constitutional rights [U.S. Const. Amend. XIV] have not been trampled upon." 32 N.J., at p. 544.
See also State v. Bowden, supra, 62 N.J. Super., at p. 358.
We are convinced that the trial court erroneously admitted the two confessions of defendant Hayes in evidence, either because the court mistakenly concluded that the burden fell upon this defendant to offer evidence preponderating in his favor, or because the court was of the view that Hayes' testimony was so lacking in credibility as to be worthless to combat the testimony offered by the police officers. As we have already noted, the burden of proving the confessions was upon the State, and Hayes' lack of truthfulness was not necessarily dispositive of the issue if there was other acceptable evidence, or inferences to be drawn therefrom, from which it could have been reasonably concluded that he was in fact beaten. Upon no other premise than that the judge was mistaken in either or both of these respects, and thus was not guided by the applicable law, can his admission of Hayes' statements and his rejection of Hagan's statement be reconciled. In the circumstances as we have described them hereinabove, we find no plausible explanation for the rejection of the testimony of the police as it bore on the Hagan confession, and acceptance of the testimony of the same men as it related to the practically contemporaneous statements of Hayes. When there is added to this the strong probability that Tassiello was also physically abused by these persons at or about the same time, we find the inference to be inescapable that Hayes was maltreated, and that his confessions resulted therefrom, and should, therefore, have been stricken from the record. A confession induced by physical compulsion has no evidential value and should not be recognized in a civilized system of justice. State v. Petrolia, 21 N.J. 453, 460 (1956); State v. Cooper, 2 N.J. 540 (1949).

*16 III.
Nor can the admission of the confessions of Hayes under the facts and circumstances here narrated be said to have been harmless simply because there was ample other evidence of guilt. What consideration they were given by the jury cannot be proved. They may have been discredited entirely and ignored by the jury, but on the contrary, they may well have been the motivating reasons for the jury's determination of guilt. State v. Petrolia, supra, 21 N.J., at p. 460.
Lastly, we are of the opinion that the laudable efforts of the trial judge to so charge the jury that the statements of Hayes, if found to have been voluntary, would have been held against him alone, while couched in impeccable language, leave great doubt that they had the desired effect. The testimony in this case consumes in excess of 600 pages of the stenographic transcript, and a substantial, if not the major part of it, was devoted to the issue of confessions; and, as we stated earlier, the lengthy summations of both sides also dealt primarily with this issue. We think that it would be fatuous to conclude that a jury, however well intentioned, would be able to exclude from its minds the statements of Hayes incriminating Hagan and Tassiello, let alone those which were self-incriminating but unworthy of consideration by the jury if it concluded that they were not voluntarily given.

IV.
This disposition of the case makes it unnecessary for us to pass upon the remaining questions raised. However, since the case must be retried we deem it advisable to observe that we find no merit in defendants' contention that their constitutional rights were invaded because they were not arraigned before a magistrate until 6 P.M. on September 9. See State v. Pierce, 4 N.J. 252 (1950).
We are also of the view that the criticism of the prosecutor's interrogation of Hayes concerning a crime which he *17 did not commit is warranted, and that such questioning should not be repeated. However, there was no objection made to it at the trial, and if that were the only matter before us, we would not reverse under the plain error rule, R.R. 1:5-1.
The judgments of conviction are reversed as to all defendants and the indictments remanded for trial.