# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3047-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.S.,[1]

     Defendant-Appellant.

_____

> Argued March 5, 2026 – Decided March 19, 2026
>
> Before Judges Mawla and Marczyk.
>
> On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 20-12-0509.
>
> Melissa Rosenblum argued the cause for appellant (Law Offices of Melissa Rosenblum, LLC, attorneys; Melissa Rosenblum and Marissa Keddis, on the briefs).
>
> Kimberly P. Will, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae,

---

[1] We use initials to protect the victim's identity. R. 1:38-3(d)(10).

Cumberland County Prosecutor, attorney; Kimberly P. Will, of counsel and on the brief).

PER CURIAM

Defendant J.S. appeals from his convictions for: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(4); first-degree kidnapping, N.J.S.A. 2C:13-1(b)(2); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1); second-degree burglary, N.J.S.A. 2C:18-2(a)(1); third-degree terroristic threats, N.J.S.A. 2C:12-3(b); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-4(d); and fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1). We affirm.

Defendant and the victim A.R. were romantic partners for twenty-four years and have two adult sons. In August 2019, A.R. broke up with defendant due to his infidelity. In 2020, after giving defendant a second chance, A.R. told him she did not love him and the relationship was over.

A.R. resided with the younger son in a home she, alone, owned. The younger son was approximately twenty years old. Defendant previously lived at the same address, but by 2020, A.R. did not allow him in her house. Nevertheless, defendant would constantly come over, uninvited, and the parties' son would let him in while A.R. was at work. Defendant refused to return his

house key, so A.R. changed the locks. A.R. testified she wanted nothing to do with defendant, but he refused to believe the relationship was over and always asked her for sex.

On the night of August 12, 2020, A.R. was preparing to fly to Texas the following morning to visit her boyfriend, whom she had been seeing for a few months. She spoke on the phone with her boyfriend and then went to bed. A.R. did not tell defendant about the relationship.

A.R. woke up around midnight to find defendant standing at the foot of her bed. When defendant saw she was awake, he reached to turn on the vanity light. A.R. jumped, sat up on her bed, and screamed. She testified defendant "just went off," calling her a "f[**]king ho" and a "bitch." He said he was in the closet recording her the entire time and heard everything she said to her boyfriend. Defendant "just kept going on and on and on, just screaming and yelling" at A.R. He then picked up a hatchet and charged at A.R., which made her "even more scared."

Defendant ordered A.R. to take her clothes off. She asked if he was crazy, and he replied, "I'm going to kill you." He raised the hatchet "as if he was going to hit" A.R. and again told her to undress. As A.R. was removing her clothes,

3

defendant held his phone as if to record her. He narrated her actions stating, "she's getting undressed." A.R. thought he was recording to humiliate her.

Once A.R. was nude, defendant pulled his pants down and sat on the edge of the bed, setting the hatchet down next to him. He grabbed A.R.'s hair and tried to make her perform oral sex. A.R. "kept saying no," but when she opened her mouth, defendant forced his penis inside her mouth. This lasted "a few minutes."

Because A.R. was not complying with defendant's demands, he stood up and ordered her to lie on the bed. He took off his pants and climbed on top of A.R., while "saying [']you love me.[']" A.R. said she did not love defendant and told him to get off her. Defendant masturbated to get an erection and penetrated A.R.'s vagina with his penis. He "said that it was his p[***]y for [twenty-four] years[ so] he could [do] what he wants." A.R. stared at the ceiling and tried to stay still until defendant finished. She did not want to chance getting hurt because he still had the hatchet at his side. Defendant ejaculated after a few minutes.

Defendant got off the bed and went to open the bedroom door. A.R. also stood up and tried to get dressed. Defendant picked up his cell phone to record her. He said they had "just finished having sex," and that he "nutted in [A.R.]

4

and that [she] liked it."  Defendant then put the phone down and threatened that he "was going to put [the video] on social media so everybody could see . . . the dirty ho that [A.R. was]."

A.R. testified defendant stood near the door and "guarded it."  The hallway outside her bedroom was narrow.  Their younger son was inside his bedroom located next to hers.  She testified defendant "started telling [their son] that your mom is trying to say that I raped her" and asked the son if he "even hear[d] her."

A.R. went to the bathroom, located in the same hallway, beyond the son's room, and washed herself.  When she came out, defendant was still standing at her bedroom door.  She felt she had no way to leave because she would have to pass defendant in the narrow hallway to exit.  So, A.R. returned to the bedroom and lay on the bed, hoping defendant would leave.

Defendant asked A.R. if she was going to call the police.  When she responded she was, defendant said he "d[id]n't give a f[**]k, that he'[d] kill [her]."  Defendant found A.R.'s cell phone on her jewelry box and smashed it with the hatchet, damaging the box as well.  He threw the phone at A.R., and it fell behind her bed.  According to A.R., defendant was so angry she "d[id]n't know what he was going to do" next.

5

Defendant then took lotion from A.R.'s vanity and began massaging her feet. He held up his phone "like he was going to record" her, and said, "I'm massaging her feet right now, and she likes it." A.R. thought if she stayed quiet, defendant would leave. However, after he finished massaging her feet, defendant stood in the bedroom for approximately two hours "just talking and running his mouth," "accusing" A.R. of "trad[ing] him for someone else." Defendant said he would come back "whenever the f[**]k he wanted to."

Defendant eventually left. A.R. assumed he took the hatchet with him, because she could not find it afterward. Police never found the hatchet.

A.R. testified she was scared when she was in the bedroom with defendant. She did not feel free to leave because "[h]e guarded the door." A.R. did not try to escape because she feared defendant would kill her. She did not call the police that night because defendant broke her phone, and she lacked a land line.

The following morning, A.R. went to her father's house and spoke with her adult daughter, who contacted police. A.R. gave a statement at the police station and then went to the hospital for a rape kit examination. The examination produced no DNA evidence of a sexual assault. A.R. gave her phone to

6

detectives who observed it was "slightly concave," "crushed," and had "pieces of the glass . . . falling out."

Police contacted A.R.'s sons. The older son initially agreed to give a statement but then declined. The younger son was interviewed. However, no witness testified about what he said during the interview.

Police located defendant, arrested him, and seized his cell phone. State Police extracted data from the phone and found a video from the morning of August 13, 2020, showing A.R. lying on her bed. In the video, defendant says, "I had to record it," and A.R. replies, "You raped me. Get out."

Another video showed defendant's conversation with the younger son, in which defendant asked: "Did you hear your mom screaming saying I raped— I'm raping her? Listen, did you hear her say I'm raping her?" The son, who was wearing headphones and playing a video game, replied, "No." Defendant then said: "We just had sex, me and her. She's trying to make it look like I raped her." The son answered, "You're trying to make it seem like it's that big of a f[**]kin' deal." Defendant reiterated he and A.R. "were just having sex."

In the recording, defendant continued:

> I came here[,] I thought I would bust a nut. I told her
> to take her clothes off. At first she said no, and then
> she threw her clothes off. I got on top of her and I got
> a no. That's what happened. I busted a nut on her. I

A-3047-23

did not rape her. She's ready to say I raped her. [To the younger son: D]id you hear her say your dad['s] raping me? Did you hear her screaming at all? Yes or no? . . . Did you hear your mom screaming or anything, making any noise, tell me to stop? Did you hear any of the above? Did you hear any of that? Yes or no?

The younger son replied, "No." The recording ends with defendant saying, "No? Okay. That's all I wanted to know."

Defendant also had video recordings on his phone from the night of the incident of a woman's voice discussing her family and other matters. At trial, A.R. identified the voice as hers and said it was the conversation she was having with her boyfriend before she went to bed on August 12. She was unaware defendant was in her home when these recordings were made. Another video, taken at 12:17 a.m. on August 13, showed the same type of pants A.R. said defendant was wearing when he attacked her.

No recordings were found on defendant's phone of A.R. undressing or of any sexual activity between the couple. When confronted about this at trial, A.R. testified she assumed defendant was recording her because of the way he was holding the phone.

Part of the defense to the burglary charge centered on the assertion that contrary to A.R.'s claims, defendant was invited to the house to fix a water pump. The parties stipulated the younger son contacted defendant to request he come

to fix the pump. A.R. did not discuss inviting defendant to her home with her son for this purpose and she did not know if defendant repaired the pump, but the home had running water on the date of the incident.

Defendant raises the following points on appeal:

> POINT I. THE TRIAL COURT COMMITTED A MULTITUDE OF REVERSIBLE ERRORS THAT WARRANT A NEW TRIAL.
>
>> A. THE TRIAL COURT COMMITTED A REVERSIBLE ERROR BY ALLOWING JUROR NUMBER TWO TO SERVE ON THE JURY, DESPITE VIEWING [DEFENDANT] IN HANDCUFFS PRIOR TO THE START OF TRIAL.
>>
>> B. THE COURT COMMITTED A REVERSIBLE ERROR IN FAILING TO PROVIDE A CURATIVE INSTRUCTION TO THE JURY. (NOT RAISED BELOW).
>>
>> C. THE COURT COMMITTED REVERSIBLE ERROR BY DENYING [DEFENDANT]'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE KIDNAPPING CHARGE AS A MATTER OF LAW.
>>
>>> i. THERE WAS INSUFFICIENT EVIDENCE SUBMITTED TO THE JURY THAT A.R. WAS KIDNAPPED.
>>>
>>> ii. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A KIDNAPPING CHARGE, SINCE A.R. WAS NOT UNLAWFULLY CONFINED

IN THE BEDROOM PURSUANT TO RELEVANT STATUTES AND CASE LAW.

iii. THERE WERE INSUFFICIENT FACTS TO SUPPORT A KIDNAPPING CHARGE AS ANY ALLEGED CONFINEMENT WAS NOT FOR A SUBSTANTIAL PERIOD OF TIME OR A PERIOD OF TIME MORE THAN INCIDENTAL TO THE ALLEGED SEXUAL ASSAULT AND DID NOT POSE AN INCREASED RISK OF HARM TO A.R.

D. THE COURT ERRED BY DENYING [DEFENDANT]'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE BURGLARY CHARGE AS A MATTER OF LAW.

i. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION AS SET FORTH IN [STATE V.] REYES[2] FOR BURGLARY, AS [DEFENDANT] ENTERED THE HOME AT THE INVITATION OF HIS SON TO FIX THE WATER PUMP AND NOT [TO] COMMIT A CRIME.

E. THE COURT COMMITTED REVERSIBLE ERROR BY DENYING DEFENSE COUNSEL'S MOTION FOR A MISTRIAL PURSUANT TO R[ULE] 3:20-1.

F. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO

---

2 50 N.J. 454 (1967).

10

GRANT A CONTINUANCE TO ALLOW [DEFENDANT TO] RETAIN NEW COUNSEL.

G. THE CUMULATIVE ERRORS, INDIVIDUALLY AND COLLECTIVELY, WARRANT THE GRANTING OF A NEW TRIAL.

POINT II: [DEFENDANT]'S SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL WAS VIOLATED WARRANTING A NEW TRIAL. (NOT RAISED BELOW).

## I.

In Point I.F of his brief, defendant argues his constitutional right to choice of counsel was violated when the trial judge denied his request for an adjournment to hire a new attorney. He claimed he could not have a fair trial because there was a communication breakdown between he and his counsel, he did not receive all the discovery, and counsel coerced him to go to trial—all of which the judge ignored. Instead, defendant maintains the judge was more concerned about the trial calendar.

In considering whether to adjourn a matter for a defendant to seek new counsel, "the trial court must strike a balance between its inherent and necessary right to control its own calendar and the public's interest in the orderly administration of justice, on the one hand, and the defendant's constitutional right to obtain counsel of [their] own choice, on the other." State v. Maisonet,

11

245 N.J. 552, 566 (2021) (quoting State v. Hayes, 205 N.J. 522, 538 (2011)). "To help trial judges balance the relevant interests when a defendant seeks an adjournment to retain counsel, we adopted a series of factors from" other jurisdictions. Ibid. Those factors include:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.
>
> [State v. Furguson, 198 N.J. Super. 395, 402 (App. Div. 1985) (quoting United States v. Burton, 584 F.2d 485, 490-91 (D.C. Cir. 1978)).]

"[T]he right to retain counsel of one's own choice is not absolute, and 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice and deprive such courts of the exercise of their inherent powers to control the same.'" Id. at 401 (citations omitted) (quoting Smith v. United

12

States, 288 F. 259, 261 (D.C. Cir. 1923)). A trial court has "the power to tightly control its own calendar so that the assignment of cases cannot be manipulated by . . . the defendant." Ibid. As a result, a defendant must "act expeditiously in obtaining counsel of [their] own choice." Ibid.

"Trial courts have broad discretion in weighing the factors and striking the proper balance, and their decisions are entitled to deference on appeal." Maisonet, 245 N.J. at 566. Judges are "require[d] . . . to conduct a 'reasoned, thoughtful analysis'" of these factors when a defendant requests an adjournment to hire new counsel. Id. at 559 (quoting State v. Kates, 216 N.J. 393, 396-97 (2014)). A decision on whether to grant a continuance to a defendant who wants to change counsel is reviewed for an abuse of discretion. Id. at 560.

Pursuant to these principles, we are satisfied the trial judge did not abuse his discretion when he denied defendant's request for new counsel. Defendant sent a letter to the court seeking new counsel on the first day of trial when a jury was about to be picked. He claimed A.R. signed an affidavit, recanting her allegations. Defense counsel interviewed A.R. prior to trial and explained, in detail, to the judge why this was not true, that A.R. had not signed an affidavit, and had every intention of seeing defendant prosecuted.

A-3047-23

Counsel denied pressuring defendant to proceed to trial. On the contrary, he asserted he counseled defendant to consider taking a plea and to receive a lesser sentence because he had exposure to a life sentence. Defendant's reply to counsel's advice was "let's do life." The judge observed the State's offer was a five-year flat sentence, and defendant had already spent thirty-six months in jail.[3]

Defense counsel explained how he was personally committed to defendant and defendant never expressed a desire to replace him. He continued to represent defendant, even though defendant's relatives had ceased paying his fees because defendant's "liberty [wa]s at stake." Counsel nonetheless used his personal funds to purchase clothing for defendant to wear at trial after a relative failed to provide clothing.

Defense counsel explained defendant had the discovery, noting his office had re-sent all the discovery to him. Defendant told counsel's secretary he had relocated his bunk area in the jail and may have lost some materials in the process. Counsel said he would be "glad to provide" defendant with the material he claimed he did not have.

---

[3] Following defendant's conviction, he received an aggregate sentence of twenty-five years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

A-3047-23

The judge analyzed the Furguson factors and concluded a new attorney would likely take "a substantial amount of time" to get "up to speed," because the case was "complicated" and involved "a lot of different charges" with serious potential consequences. Defendant did not have other competent counsel prepared to try the case. The judge observed the parties had been "laboring . . . [for] several months" to get the case to the point of jury selection, and there had been "a number of continuances." The court held roughly thirteen conferences, and the case was trial-ready months in advance of the first trial date. The judge concluded defendant was not prejudiced by continuing with his attorney.

The record amply supports the judge's decision to deny defendant's request was not an abuse of discretion. None of defendant's reasons for wanting new counsel at the eleventh hour were supported by the facts in the record.

II.

In Points I.A and I.B, defendant argues the trial judge should have dismissed a juror whom defendant claims saw him in handcuffs prior to trial. For the first time on appeal, he claims the court erred by failing to issue a curative instruction concerning his incarceration and to explain his appearance.

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants the

15

right to an impartial jury during trial. State v. R.D., 169 N.J. 551, 557 (2001). Criminal defendants are "entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." State v. Williams, 93 N.J. 39, 60 (1983). "The securing and preservation of an impartial jury goes to the very essence of a fair trial." Ibid.

"[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." R.D., 169 N.J. at 557-58. "[T]he court must . . . determine whether the jurors are capable of fulfilling their duty in an impartial and unbiased manner." State v. McGuire, 419 N.J. Super. 88, 153 (App. Div. 2011).

"[T]he trial court is in the best position to determine whether the jury has been tainted." R.D., 169 N.J. at 559. It must "consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." Ibid. If there is a possibility of juror taint, the judge must voir dire the potentially tainted juror

A-3047-23

and, "in appropriate circumstances, the remaining jurors." State v. Bisaccia, 319 N.J. Super. 1, 13 (App. Div. 1999).

A new trial is not warranted in every instance where a juror may have been exposed to outside information. R.D., 169 N.J. at 559. "[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217 (1982).

A defendant's freedom from handcuffs or shackles in the presence of the jury is "important to his right to a fair and impartial trial." State v. Damon, 286 N.J. Super. 492, 498 (App. Div. 1996). One reason "for not keeping a defendant restrained is 'to avoid a prejudice in the mind of the jury against the accused as being a dangerous [person].'" Ibid. (quoting State v. Jones, 130 N.J. Super. 596, 599 (Law Div. 1974)). However, a defendant "is not denied a fair trial and is not entitled to a mistrial solely because he was momentarily and inadvertently seen in handcuffs by jury members" outside the courtroom. Jones, 130 N.J. Super. at 602.

In State v. Sykes, jurors saw the defendant in handcuffs in a public hallway while he was being brought back to the courtroom after a lunch recess. 93 N.J. Super. 90, 91-92 (App. Div. 1966). We concluded there was no prejudice by this brief viewing. Id. at 94; see also Jones, 130 N.J. Super. at 602

17

(defendant's "fleeting episode" of exposure to the jury in handcuffs outside the courtroom was not "sufficiently prejudicial to impair his fundamental right to a fair trial").

Here, following jury selection, the court took a lunch break. After the break, the trial judge conducted a sidebar with counsel regarding an issue with a member of the jury. After the jury entered the courtroom, the judge called Juror #2 to sidebar. The judge then informed the jury he had been "tending to some logistics" and asked the prosecutor to begin her opening statement.

After trial ended for the day, the prosecutor stated she "want[ed] to make sure . . . what happened with [J]uror #2" was "clear on the record." The prosecutor stated: "defendant's okay with it" and she had "deferred . . . to defense counsel" about whether Juror #2 should be "[struck] out of an abundance of caution."

The prosecutor then stated a sheriff's officer indicated that while walking by the jury room with defendant, she saw Juror #2 opening the door. However, the officer "just saw [Juror #2]" and did not say she thought Juror #2 saw defendant. At sidebar earlier in the day, the judge asked Juror #2 if she saw defendant, and she replied, "Who's the defendant?" When the judge pointed out defendant to Juror #2 she answered, "No." After he told Juror #2 who defendant

was, he asked once more if she "[had seen] . . . defendant in the back hallway" and she answered, "No, I didn't see him."

After the trial, defendant's new counsel moved for a new trial arguing Juror #2 had seen defendant while he was in handcuffs with a sheriff's officer. Counsel asserted even though the juror might not have realized defendant was the defendant for the trial on which the juror was empaneled, the judge should have dismissed her nonetheless. According to counsel, Juror #2 had "commented and made a remark that she knew the [s]heriff['s] [o]fficer," which suggested she did see that officer with defendant. Counsel alleged even though the juror did not initially know who defendant was, she "indicate[d] that later she understood . . . it was the same individual" she had seen "in custody, shackled[,] and surrounded by three officers."

The prosecutor recounted the sidebar with Juror #2, where the trial judge pointed out to the juror who defendant was and the juror's response. She also recounted defense trial counsel and defendant had a private "back and forth . . . that led to them not asking for [Juror #2] to be removed." The judge had the same recollection.

Although the sheriff's officer acted appropriately by reporting Juror #2's possible sighting of defendant to the trial judge, the record readily shows Juror

19

#2 neither saw defendant in handcuffs nor knew defendant was the person being escorted in the hallway. Regardless, the trial judge acted promptly to confront the juror about the potential sighting and based on the sidebar discussions, neither the judge nor either counsel was convinced there was juror taint. For these reasons, the judge did not abuse his discretion.

It follows there was no reversible error when the judge did not sua sponte give the jury a curative instruction regarding defendant's incarceration. Where a defendant does not request an instruction or object to the lack of one, we review a trial judge's actions under a plain error standard. State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2; R. 1:8-7(b). Given that no juror saw defendant in handcuffs, there was no reason to instruct the jury.

III.

In Point I.E of his brief, defendant argues the court erred by denying his motion for a mistrial after A.R. testified: she had obtained restraining orders against defendant; he chased her car with a machete; their sons were angry at her because defendant was in jail; and he took Percocet and Xanax. Defendant claims this was improper prior bad acts evidence, which deprived him of a fair trial.

20

A mistrial is "an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Allah, 170 N.J. 269, 281 (2002)). Alternatives to declaring a mistrial include "a curative instruction, a short adjournment or continuance, or some other remedy." Ibid.

"The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court." Harvey, 151 N.J. at 205. We defer to a trial judge's decision because they are "in the best position to gauge the effect of the allegedly prejudicial evidence." Ibid. Thus, we do not disturb a decision to deny a mistrial motion, "absent an abuse of discretion that results in a manifest injustice." Ibid.

During A.R.'s direct examination regarding the rape kit examination, she testified she felt violated but was thankful she was still alive because defendant could have killed her. She explained it "looked like he was under the influence" when he attacked her and that he "takes Percocets and Xanax." Defendant did not object to this testimony.

21

On cross-examination, defense counsel asked A.R. when she ended her relationship with defendant. A.R. responded the relationship ended in August 2019, but defendant called her at work "nonstop" after she was denied a restraining order. She explained she obtained a restraining order "[s]everal times." Defense counsel asked her if she did so to be with her boyfriend and she responded: "No. Restraining orders were in place even before [my boyfriend] existed."

Defense counsel asked about an alleged incident in which the boyfriend pulled a gun on defendant and asked if defendant obtained a restraining order then. A.R. did not recall the incident and said "I just recall when [defendant] chased me in the car and threw the machete at the car . . . when [my boyfriend] was in it." She then recounted the incident occurred while she was driving her boyfriend on July 26, 2020. Defendant chased them with his vehicle, cut them off, and then he and the boyfriend exited the cars and began "talking back and forth." A.R. testified defendant then "went back to his car and got the machete out [of] the back," and "threw the machete at [her] car." A.R. and her boyfriend drove away, and defendant got back in his car and continued to chase them.

Later, defense counsel questioned A.R. about whether the children were angry with her and whether the older son was angrier with her than the younger

22

one. A.R. explained the children were not angry, but instead frustrated with the situation. The older son was "upset because he says that he wants his dad out, because his dad is telling him from jail that he's having heart problems . . . . Like he manipulates him on the phone."

Following A.R.'s testimony, the prosecutor asked the judge whether the parties could address the testimony regarding the existence of a restraining order, defendant's incarceration, and his use of prescription drugs elicited on cross-examination. The judge found nothing prejudicial regarding the mention of prescription drugs, and the defense raised no concern about the issue. The defense also did not complain about the incident regarding the machete. Nonetheless, the prosecutor suggested a limiting instruction regarding the restraining orders and defendant's incarceration may be appropriate. When the judge asked defense counsel if he wanted a limiting instruction, counsel sought a mistrial because he did not think an instruction would cure the prejudice.

The judge noted the defense raised the existence of the restraining orders. Also, A.R.'s testimony did not indicate there was a restraining order in place the day of the incident. The judge similarly noted the defense's questioning led A.R. to mention defendant's incarceration. He observed "most thinking jurors think that a person charged with a first-degree aggravated sex[ual] assault probably is

23

in jail." Even so, the judge found there was no evidence showing defendant was in jail at the time of trial; he was not shackled and did not wear a jail uniform during the trial. He concluded a limiting instruction would only draw attention to these issues and denied the request for a mistrial.

The parties continued to debate the issue. Although the judge disagreed there was an issue, he asked the parties to draft proposed limiting instructions regarding the restraining order and incarceration issues.

The next day of trial, the judge read a proposed instruction prepared by the prosecutor. It said: "You have heard testimony referencing incarceration and restraining orders. This testimony should not be considered in your deliberations. Jurors should not consider this in determining whether or not the State has proven each element of the crime charged beyond a reasonable doubt." The defense agreed the instruction was fine and the judge gave the jury the instruction as a part of the final jury charge.

"The admission or exclusion of evidence at trial rests in the sound discretion of the trial court." State v. Willis, 225 N.J. 85, 96 (2016). Where the trial court has not fully analyzed the admissibility of other-bad-acts evidence, we "may conduct a plenary review." State v. Barden, 195 N.J. 375, 391 (2008).

A-3047-23

"The mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Morton, 155 N.J. 383, 453-54 (1998). Evidence is inadmissible when its relevance "is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403(a). "[E]vidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." N.J.R.E. 404(b)(1).

Trials are "often unpredictable," and "even the most precise question" by an attorney "may bring an unexpected response from a witness" which causes inadmissible evidence to come to the jury's attention. Yough, 208 N.J. at 397. "Alleged errors induced by counsel 'ordinarily are not a basis for reversal on appeal.'" Id. at 399 (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). There must be a clear showing the defendant suffered actual harm. State v. LaBrutto, 114 N.J. 187, 207 (1989). If it is likely "the results of the trial would have been the same," the mistake is considered harmless. State v. Camacho, 218 N.J. 533, 554 (2014).

The evidence of the restraining order and defendant's incarceration should not have been admitted. However, in both instances, the State did not elicit this information. Having considered the entire record, we are convinced these errors

25

were harmless and the information did not lead to an unjust result, especially considering the fact the judge gave the jury a curative instruction to disregard this evidence. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007). We have no reason to believe the jury did not follow the judge's instruction.

We decline to conclude the mention of the machete and prescription drugs constituted reversible error. The testimony regarding the prescription drugs was volunteered by A.R. and was not elicited by the prosecutor. The defense did not object to this evidence or cite it as grounds for a mistrial. The use of prescription drugs did not qualify as prior bad act evidence. The testimony regarding the machete was elicited by the defense and was not cited as a basis for the mistrial motion.

## IV.

In Points I.C and I.D, defendant argues the trial judge should have granted his motion for acquittal on the kidnapping and burglary charges, respectively. He claims the State did not prove he confined A.R. at all, much less for a substantial period to support the kidnapping charge. A.R. left the bedroom after the alleged assault, and there was no evidence he forced her back into the

bedroom with him. He also contends any confinement was "incidental to" the alleged sexual assault. Defendant asserts acquittal was warranted on the burglary charge because the State did not prove he was not "licensed or privileged" to enter A.R.'s home or that he entered "with [the] purpose to commit an offense," because the son invited him over to fix the water pump.

A judgment of acquittal should be entered at the close of the State's case "if the evidence is insufficient to warrant a conviction." R. 3:18-1. The court must decide "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014). The burden is upon the defendant to show the evidence did not support the jury's verdict. State v. Papasavvas, 170 N.J. 462, 479-80 (2002).

On appeal, we apply the same standard as the trial court. See Williams, 218 N.J. at 593-94. We review the sufficiency of the evidence presented on an acquittal motion de novo. Ibid.

A.

N.J.S.A. 2C:13-1(b)(2) states a person is guilty of kidnapping if they "unlawfully confine[] another for a substantial period" with the purpose "[t]o

inflict bodily injury on or to terrorize the victim or another." N.J.S.A. 2C:13-1(d) defines an "unlawful" confinement as one which "is accomplished by force, threat, or deception." The requirement that a period of confinement be "substantial" is intended "to prevent an overly broad reading" of the kidnapping statute, by limiting kidnapping to incidents in which the duration of the confinement, when combined with the purpose of the perpetrator, renders the action particularly dangerous or terrifying to the victim. State v. Cruz-Pena, 243 N.J. 342, 355 (2020). Thus, "not every . . . confinement of a victim is a kidnapping." State v. La France, 117 N.J. 583, 586 (1990).

"A kidnapping is criminal conduct that is 'not ordinarily inherent in the underlying criminal conduct itself' or 'merely incidental to the underlying crimes.'" Cruz-Pena, 243 N.J. at 356 (quoting La France, 117 N.J. at 589-90). To be considered a kidnapping, a confinement must "substantially increase the risk of harm beyond that necessarily present in the crime itself." La France, 117 N.J. at 587. For example, where "the burglar puts the householder in the closet while he fills his sack with the silver," this brief confinement will not support an additional charge of kidnapping. Ibid. (quoting State v. Estes, 418 A.2d 1109, 1113 (Me. 1980)). While "a sexual assault necessarily requires a confinement of the victim," it "is not transformed into a kidnapping" unless the length of the

confinement is "substantial." Cruz-Pena, 243 N.J. at 356. Instead, the "substantial-period-of-confinement requirement[] address[es] a scenario where a defendant 'isolates the victim and exposes [them] to an increased risk of harm.'" Ibid. (quoting State v. Masino, 94 N.J. 436, 445 (1983)). This is because "[t]he forlorn state of the victim remain[s] the paramount evil of kidnapping." Masino, 94 N.J. at 441.

When assessing a kidnapping charge, "juries must make a qualitative judgment about the nature of . . . the confinement." La France, 117 N.J. at 593. The statute's durational requirement is "not susceptible to a neat mathematical formulation." Cruz-Pena, 243 N.J. at 356. A confinement may be considered "incidental to another crime" if it is "of minimal duration," while "a prolonged confinement" may not be considered incidental. Id. at 357. A kidnapping conviction may nevertheless be upheld "where the period of confinement was not relatively long, but where the terror and depraved acts committed against the victims combined with their isolation and helplessness [is] severe." Ibid. Although N.J.S.A. 2C:13-1(b) "distinguishes kidnapping from conduct that is merely incidental to the underlying crimes," it "does not make kidnapping a 'free crime' when it accompanies another violent crime such as rape or robbery." La France, 117 N.J. at 590. Indeed, the statute itself requires a non-ransom

kidnapping "be committed with the purpose of committing another unlawful act." State v. Brent, 137 N.J. 107, 125 (1994).

In Cruz-Pena, the defendant held the victim at knifepoint for four-to-five hours on the porch of an abandoned house, while forcing her to perform various sex acts. 243 N.J. at 348-50. The Court found although "the length of the confinement [wa]s co-extensive with the continuous sexual and physical abuse of the victim," it was not "merely incidental" to the sexual assault and thus, a kidnapping conviction could be sustained. Id. at 346. Based on the evidence presented, "[t]he jury was entitled to make highly fact-sensitive determinations in deciding whether [the victim] was confined for a 'substantial period.'" Id. at 346-47.

In State v. Jackson, the defendant's gunpoint robbery of the victim, a taxi driver, "consumed a short span of time," but he then forced the victim to drive him "through the city of Paterson." 211 N.J. 394, 419 (2012). The Court affirmed the defendant's conviction, concluding "the victim's peril lasted significantly longer" than the initial time it took for the defendant to steal his cash and wallet, and he was "exposed to a substantially extended confinement and a substantially increased risk." Ibid.

By contrast, in State v. Purnell, the defendant sexually assaulted the victim in a stairwell and then ordered her to "remain there until he left the building." 394 N.J. Super. 28, 54 (App. Div. 2007). It took him approximately thirty seconds to descend the stairs and leave. Ibid. The State argued this additional period constituted a kidnapping because the victim knew the defendant had a knife and "was in fear for her safety if she left the landing before he left the building." Ibid. We reversed because it was "very doubtful" the brief period the victim was left on the landing "[could] be properly characterized as confinement," and since the defendant was leaving the scene, the risk of harm to the victim was "diminishing, not increasing." Id. at 54-55.

Following close of the State's case, defendant moved for acquittal on the kidnapping, arguing there was no testimony he had confined A.R. for a substantial period of time. A.R. testified she went to the bathroom and came back to the bedroom following the assault. She did not testify defendant threatened to harm her if she tried to leave the bedroom again. The judge denied the motion because the evidence established A.R. was not free to leave. Defendant stood in, and partially blocked, a narrow hallway leading to and from the bedroom and bathroom. Plaintiff testified she was scared and did not know what defendant was capable of because he "was ranting and raving."

The trial judge did not err. Although A.R. testified she left the bedroom after defendant sexually assaulted her, she also testified there was no way for her to get to an exit without passing defendant, who was standing by her bedroom door, in the narrow hallway. Defendant had threatened her with a hatchet, forcibly sexually assaulted her, and said he would kill her if she did not comply. Afterwards, A.R. said defendant threatened to kill her if she tried to contact police and subsequently used the hatchet to smash her cell phone. By rendering her phone inoperable, defendant left A.R. more isolated and unable to seek help. Defendant then massaged her feet, putting him in close physical proximity to her while she tried to stay still, in hopes he would leave. However, he remained in the bedroom for two more hours, continuing to "guard" the door, while ranting angrily against her and saying he would return to her home whenever he liked. This period extended long after the underlying sexual assault was completed, and defendant had access to the hatchet the entire time.

Giving the State the benefit of all favorable inferences from this testimony, a reasonable jury could have found defendant's actions in "guarding" the bedroom door intimidated A.R. into returning to that room, instead of trying to escape. A jury could also have concluded A.R. was "confined," and the confinement was "substantial" and not merely "incidental to" the assault.

A-3047-23

B.

Under N.J.S.A. 2C:18-2(a)(1), a person is guilty of burglary if they enter a premises while not "licensed or privileged" to do so, "with purpose to commit an offense therein." "Burglary is complete upon entry with the purpose of committing an offense," whether or not that offense is successfully accomplished. State v. Robinson, 289 N.J. Super. 447, 453 (App. Div. 1996).

Where the evidence "[p]lainly" indicates a defendant's actions "are inconsistent with lawful conduct," an unlawful purpose may be inferred from those actions. State v. Tassiello, 75 N.J. Super. 1, 6 (App. Div. 1962). In Tassiello, the defendants returned to a locked and darkened restaurant shortly after leaving it, knowing it was unattended, and "entered it by breaking or otherwise" while one of them stood as a lookout. Ibid. There was no evidence that once inside the building, the defendants stole anything or committed any other crime. Id. at 5. We concluded the State had presented sufficient evidence to defeat a motion for acquittal of the burglary charge, because the defendants' conduct evinced an unlawful intent in entering the restaurant, and the matter "required jury determination of the issues presented." Id. at 6.

Defendant argued the burglary charge could not stand because even though A.R.'s name was on the home's mortgage, he could have an equitable

interest in the home, having lived there as her partner and raising children with her. The judge denied an acquittal on the burglary charge because the State proved A.R. owned the house and "didn't want [defendant] there." A.R. said she would call the police and say defendant was trespassing if he insisted on coming. The record lacked evidence to support finding defendant had an equitable interest in the home. We discern no error.

At the outset, we note defendant did not raise the burglary charge as a part of his acquittal motion. It was instead raised in his motion for a new trial. We address the argument for the sake of completeness.

As we recounted, there was testimony defendant was sometimes let into A.R.'s home by the younger son, and the parties stipulated the son had invited defendant there to fix the water pump the day before the incident. However, there was no evidence defendant came into the house on August 12 to fix the pump. A.R. denied telling the son to summon defendant to fix the pump. She testified she showered before going to bed, which shows the pump must have been fixed before then. A.R. testified, as owner of the house, she did not want defendant there. She repeatedly stated she wanted nothing more to do with him and changed the locks to prevent him from entering the home. Giving the State

34

the benefit of all favorable inferences, there was sufficient evidence defendant was not "licensed or privileged" to enter A.R.'s house on August 12 or 13, 2020.

The State also presented sufficient evidence defendant entered with the purpose to commit an offense. A.R. testified defendant brought a hatchet and told her he hid in her closet and listened to her conversation with her boyfriend. Recordings were found on his phone capturing parts of her conversation. A.R. also testified defendant frequently demanded sex and she refused. Giving the State the benefit of this testimony, a reasonable jury could have found defendant came into A.R.'s house with a purpose "inconsistent with lawful conduct." Tassiello, 75 N.J. Super. at 6.

V.

In Point I.G, defendant argues even if none of the errors raised on appeal independently warrant reversal, their cumulative effect does. "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' — that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" State v. J.L.G., 234 N.J. 265, 306 (2018) (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)). Error which may itself be harmless, when combined with

another error may have a "cumulative effect [which] can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008).

We are unconvinced there was prejudicial error on either an individual or cumulative basis. "[A] defendant is entitled to a fair trial, [but they are] not entitled to a perfect trial, 'for there are no perfect trials.'" United States v. Payne, 944 F.2d 1458, 1477 (9th Cir. 1991) (quoting Brown v. United States, 411 U.S. 223, 231-32 (1973)). Defendant received a fair trial.

## VI.

Finally, in Point II of his brief, defendant argues he was denied his constitutional right to effective assistance of counsel. He asserts trial counsel was ineffective for: failing to move for a mistrial when the State referenced A.R.'s restraining order against him in its opening statement; allowing A.R. to give prejudicial testimony without moving to strike it; failing to obtain the handwritten notes of the lead detective even though he asked for them at trial; failing to call the younger son as a witness; failing to provide him with all discovery; and coercing him into going to trial, instead of pleading guilty.

To establish ineffective assistance of counsel, a defendant bears the burden of satisfying the two-prong test of Strickland v. Washington, which requires a showing trial counsel's performance was deficient and, but for the

36

deficient performance, the result would have been different. 466 U.S. 668, 687 (1984). Our Supreme Court has expressed a preference for resolving ineffective assistance of counsel claims, like those presented here, on collateral review. State v. Preciose, 129 N.J. 451, 459-60 (1992). "Contentions of ineffective assistance of counsel are more effectively addressed through petitions for post-conviction relief [PCR], at which point an appropriate record may be developed." State v. Rambo, 401 N.J. Super. 506, 525 (App. Div. 2008).

We conclude defendant's ineffective assistance of counsel claims are better presented in a PCR petition. This is especially the case regarding the claims his attorney did not provide him with discovery and coerced him to proceed with the trial rather than enter a guilty plea. The facts regarding both issues must be developed because they largely reside outside the trial record. The remaining four arguments defendant raises would also benefit from a fuller record, since they may involve matters of strategy, rather than prejudicial errors made by counsel.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division